[Cite as *In re N.L.*, 2013-Ohio-3983.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN THE MATTER OF:                          CASE NO.  5-12-38

N.L.,

ALLEGED DEPENDENT CHILD.                   O P I N I O N

IN THE MATTER OF:                          CASE NO.  5-12-39

L.L.,

ALLEGED DEPENDENT CHILD.                   O P I N I O N

Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 20930027 and 20830037

Judgments Affirmed

Date of Decision:   September 16, 2013

APPEARANCES:

*Garth W. Brown* for Appellants

*Nicole M. Winget* for Appellee, Nicole Bower

**PRESTON, P.J.**

{¶1} Appellants, Randy and Patty Powell (the "Powells"), appeal the November 15, 2012 judgment entries nunc pro tunc of the Hancock County Court of Common Pleas, Juvenile Division, granting the motion of Mother-Appellee, Nicole Bower ("Bower"), for a change in disposition regarding legal custody of the minor children L.L. and N.L. We affirm.

{¶2} These consolidated appeals were before us in prior consolidated appeals, *In re L.L.*, 3d Dist. Hancock Nos. 5-12-05 and 5-12-06, 2012-Ohio-4346. We recited the following facts in that opinion:

The minor child L.L. was born in July of 2008, and the minor child N.L. was born in July of 2009. Bower and William Lentz are the biological parents of the two children.

On August 28, 2008, the Hancock County Job and Family Services Child Protective Services Unit (hereinafter "CPSU") filed a complaint alleging that L.L. was a dependent child pursuant to R.C. 2151.04(B) and (C). (L.L. Doc. 1). The complaint alleged that CPSU received a report that Bower and Lentz "were both seeing and hearing demonic spirits in the home." (*Id.*) Further, the complaint alleged that Lentz had a history of using inhalants, and that Lentz was a registered sex offender based upon an incident from 2004.

(*Id.*) The complaint alleged that there was a report from Robin Brown with Century Health wherein Brown expressed concerns regarding the parents potentially trying to "exorcise evil from the baby which may hurt the child." (*Id.*)

Also on August 28, 2008, CPSU filed a motion for pre-dispositional interim orders, requesting that emergency temporary custody of L.L. be granted to CPSU. (*Id.*)

On August 28, 2008, the court granted the ex parte order of emergency temporary custody to CPSU pending a full hearing. (L.L. Doc. 2).

On September 3, 2008, the court filed an entry granting emergency temporary custody of L.L. to CPSU. The court found that CPSU had made reasonable efforts to prevent the removal of L.L. and also found that removal was in L.L.'s best interest. (L.L. Doc. 4).

On September 11, 2008, Bower admitted to the allegations in the complaint that L.L. was dependent pursuant to R.C. 2151.04(B) and (C). The court thus found by clear and convincing evidence that L.L. was a dependent child as alleged.

On September 15, 2008, Julie Niswander was appointed CASA/GAL for L.L. in this case. (L.L. Doc. 11).

On September 16, 2008, Bower, along with Lentz, did not contest the evidence presented at the shelter care hearing and did not contest the court finding that L.L. was dependent as alleged in the complaint. (L.L. Doc. 13). The court therefore found by clear and convincing evidence that L.L. was a dependent child as alleged in the complaint. (*Id.*)

On November 17, 2008, the Powells filed a motion for relative placement of L.L. (L.L. Doc. 18). At a hearing on November 21, 2008, that motion was withdrawn and L.L. remained in the custody of foster parents. In an entry filed after that hearing, the court adopted a case plan filed September 16, 2008. (*Id.*)

On May 21, 2009, on a review of the case, it was determined that relative placement was possible with the Powells and that the Powells were willing to take custody of L.L. and work with CPSU.

In July of 2009, N.L. was born. On July 21, 2009, CPSU filed a complaint alleging that N.L. was a dependent child pursuant to R.C. 2151.04(b), (c), and (d). The complaint alleged that Bower could not "adequately protect her children as she often flees from the

home to escape Mr. Lentz, but later returns." The complaint further alleged that prior psychological evaluations precluded the return of L.L. to the custody of Bower, and that the home-based therapist had received threats from Lentz.

Also on July 21, 2009, CPSU filed a motion requesting an ex parte order of emergency temporary custody of N.L. to CPSU. (N.L. Doc. 1).

On July 23, 2009, the Powells filed motions for relative placement for L.L. and N.L. (L.L. Doc. 27); (N.L. Doc. 4). On that same day, the court ordered the children into the emergency custody of the Powells. (L.L. Doc. 28); (N.L. Doc. 7).

On July 24, 2009, the court filed an entry finding that probable cause existed to place L.L. and N.L. into the Powells' legal custody, subject to protective supervision of CPSU, and that it was in the children's best interests. (L.L. Doc. 29); (N.L. Doc. 9).

On August 12, 2009, Julie Niswander was appointed GAL for N.L. (N.L. Doc. 12).

On September 3, 2009, Bower admitted to the allegations alleged in the complaint regarding N.L. being a dependent child pursuant to R.C. 2151.04(b), (c), and (d). (N.L. Doc. 17).

On October 1, 2009, a disposition hearing was held wherein N.L. was placed into the Powells' legal custody subject to protective supervision by CPSU. (N.L. Doc. 21).

On February 12, 2010, the court adopted the case plan for N.L. filed February 11, 2010. (N.L. Doc. 28).

On February 23, 2010, a new CASA/GAL was assigned to this case, Stephanie Stephan, replacing the prior GAL, Julie Niswander. (L.L. Doc. 45); (N.L. Doc. 32).

On April 27, 2010, a motion to terminate CPSU's protective supervision was filed. (L.L. Doc. 46); (N.L. Doc. 33). The court terminated said supervision with the Powells having legal custody of L.L. and N.L. and visitation with Bower continuing as previously ordered. ([L.L.] Doc. 47); (N.L. Doc. 34).

On May 12, 2011, the court ordered that protective supervision be reinstated. (L.L. Doc. 57); (N.L. Doc. 45).

On June 3, 2011, Bower filed motions to change custody of L.L. and N.L. (L.L. Doc. 59); (N.L. Doc. 47). On June 13, 2011, a hearing was held wherein those motions to change custody were withdrawn. (L.L. Doc. 66); (N.L. Doc. 54).

On July 7, 2011, GAL Stephanie Stephan filed for a motion for change in disposition of L.L. and N.L. (L.L. Doc. 68); (N.L. Doc. 56). Stephan's motion was accompanied by an affidavit asserting, *inter alia*, that Bower had made substantial progress on her case plan, and that there were various issues with Mrs. Powell caring for the children. (*Id.*); (*Id.*)

On July 7, 2011, the court ordered that Bower be designated as temporary custodian of L.L. and N.L. (L.L. Doc. 69); (N.L. Doc. 57).

On July 19, 2011, Bower filed her own motions to change custody of L.L. and N.L. to her due to "safety concerns at their current residence," arguing also that it was in the children's best interests. (L.L. Doc. 75); (N.L. Doc. 64).

The court held hearings on the motions August 15, 2011, September 30, 2011, November 21, 2011, and December 22, 2011. After the final hearing, the court took the matter under advisement.

On January, 9, 2012, the court filed its entries granting custody of L.L. and N.L. to Bower, finding that it was in the best interests of the children. (L.L. Doc. 89); (N.L. Doc. 77). The court's opinions read:

> **After thoroughly considering all evidence presented, this court finds that it would be in the best interest of the children to grant the motion of the CASA/GAL and the mother to return custody to the mother. The custody shall be subject to the protective supervision of [CPSU] * * *.**

(*Id.*); (*Id.*)

*In re L.L.*, 2012-Ohio-4346, at ¶ 2-28.

{¶3} The Powells appealed those identical entries to this Court, arguing "that the trial court did not make all of the required findings to modify or terminate the Powells' legal custody of L.L. and N.L." *Id.* at ¶ 30. Specifically, the Powells argued "that in order to modify or terminate the disposition placing L.L. and N.L. in the Powells' legal custody, the trial court was required to find that there was a change in circumstances, *and* that it was in the children's best interests that a change be made," and that "the trial court did not find a change in circumstances." (Emphasis sic.) (*Id.*).

{¶4} In our analysis in that appeal, we noted that the trial court granted the Powells—relatives of L.L. and N.L.—legal custody of L.L. and N.L. under R.C. 2151.353(A)(3), which "provides the trial court with the authority to grant legal custody to relatives of the minor children following a finding of dependency and

the filing of a motion by those relatives." *Id.* at ¶ 31. We also noted that R.C. 2151.353(E)(1) and (2) provide guidelines for the modification or termination of a R.C. 2151.353(A)(3) dispositional order. *Id.* at ¶ 32. R.C. 2151.353(E)(2) and 2151.417(B) direct trial courts to R.C. 2151.42, which explains that R.C. 2151.353(A)(3) dispositional orders are "intended to be permanent in nature" and sets forth the findings a trial court must make before modifying or terminating an order:

> (A)  At any hearing in which a court is asked to modify or terminate an order of disposition issued under section 2151.353, 2151.415, or 2151.417 of the Revised Code, the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child.
>
> (B)  An order of disposition issued under division (A)(3) of section 2151.353, division (A)(3) of section 2151.415, or section 2151.417 of the Revised Code granting legal custody of a child to a person is intended to be permanent in nature. A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that *a change has occurred in the circumstances of the child or the person who was granted*

-9-

*legal custody*, and that modification or termination of the order is

*necessary to serve the best interest of the child.*

(Emphasis added.)  R.C. 2151.42.  *See also In re L.L.*, 2012-Ohio-4346, at ¶ 33; *In re Osberry*, 3d Dist. Allen No. 1-03-26, 2003-Ohio-5462, ¶ 9-12.

{**¶5**} We found R.C. 2151.42 applicable and reversed and remanded in the prior appeal because the trial court failed to include in its judgment entries a finding that a change had occurred in the circumstances of L.L. and N.L. or the Powells, as required by R.C. 2151.42(B).  *In re L.L.*, 2012-Ohio-4346, at ¶ 35-36, quoting (L.L. Doc. No. 89) and (N.L. Doc. No. 77).

{**¶6**} On remand, the trial court issued identical November 15, 2012 judgment entries nunc pro tunc in L.L.'s and N.L.'s cases.  (L.L. Doc. No. 113); (N.L. Doc. No. 99).   In those judgment entries, the trial court noted that their purpose was "to correct an omission in the [trial] court's previous judgment entr[ies] dated January 8, 2012 wherein the [trial] court failed to note its finding that there had been a change in circumstances since the [trial] court's original award of legal custody." (*Id.*); (*Id.*).  The trial court went on to explain its change-in-circumstances and best-interest findings.  (*Id.*); (*Id.*).

{¶7} The Powells filed their notices of appeal on December 13, 2012.[1] (L.L. Doc. No. 118); (N.L. Doc. No. 104). They raise one assignment of error for our review.

### Assignment of Error

**The trial court erred and abused its discretion when it used a reunification standard and failed to complete a best interest analysis.**

{¶8} In their assignment of error, the Powells argue that the trial court failed to apply R.C. 2151.42(B)'s two-part test and to cite evidence supporting its change-in-circumstances and best-interest findings. The Powells argue that the language of the trial court's judgment entries nunc pro tunc is consistent with the goal of reunification following a temporary custody order rather than the required two-part test in R.C. 2151.42(B). Finally, the Powells argue that the trial court ignored the manifest weight of the evidence against reunification with Bower being in the best interest of L.L. and N.L.

{¶9} "A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child." *In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 10, citing R.C. 2151.353(A). *See also* Juv.R. 34(D). "Appellate courts review a dispositional order that awards, modifies, or terminates legal

---

[1] "[U]nder Ohio law, a 'nunc pro tunc order is entered as of the date of the original judgment, however if there is a modification which affects the parties' rights, appeal may be perfected from the actual date of the nunc pro tunc order.'" *Gary Moderalli Excavating, Inc. v. Trimat Constr., Inc.*, 5th Dist. Tuscarawas Nos. 2012 AP 03 0022 and 2012 AP 03 0023, 2013-Ohio-1701, ¶ 73, quoting *Perfection Stove Co. v. Scherer*, 120 Ohio St. 445 (1929). Here, the parties do not dispute that the trial court's November 15, 2012 judgment entries nunc pro tunc included modifications that affected their rights.

custody under the abuse of discretion standard." *In re T.J.*, 10th Dist. Franklin Nos. 10AP-201 and 10AP-202, 2010-Ohio-4191, ¶ 14, citing *In re N.F.*, 10th Dist. Franklin No. 08AP-1038, 2009-Ohio-2986, ¶ 9. *See also In re L.M.*, 2d Dist. Greene No. 2010-CA-76, 2011-Ohio-3285, ¶ 15 ("We review the trial court's determination regarding a change of circumstances for an abuse of discretion."). The term "abuse of discretion" connotes more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *In re T.J.* at ¶ 14, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A reviewing court will not reverse the trial court's dispositional decision as being against the manifest weight of the evidence if it is supported by competent, credible evidence. *In re C.W.* at ¶ 11.

{¶10} To modify its original order granting legal custody of L.L. and N.L. to the Powells, the trial court was required under R.C. 2151.42(B) to "explicitly find[ ], based on facts that have arisen since the prior order or were unknown to the court at that time 'that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.'" *In re L.V.*, 9th Dist. Summit No. 26245, 2012-Ohio-5871, ¶ 8, quoting R.C. 2151.42(B). "These requirements exist 'because some degree of permanence or finality is necessary in

custody determinations.'" *Id.*, quoting *In re J.S.*, 11th Dist. Lake No. 2011-L-162, 2012-Ohio-4461, ¶ 27.

**{¶11}** We first address the change-in-circumstances requirement. "[N]ot every change will support modifying a custody order." *In re L.M.* at ¶ 15, citing *In re A.N.*, 2d Dist. Greene Nos. 2010 CA 83 and 2011 CA 7, 2011-Ohio-2422, ¶ 23. "The question is whether the change is one of substance that warrants a change of custody." *Id.*, citing *In re A.N.* at ¶ 23. In this case, the trial court made an "express finding," based on facts that arose since the original order of custody, that a change occurred in the circumstances of the children under R.C. 2151.42(B). (L.L. Doc. No. 113); (N.L. Doc. No. 99).

**{¶12}** In support of its finding, the trial court noted that three witnesses testified to "acts of abuse in the Powell home since the award of custody." (*Id.*); (*Id.*). The Powells' twelve-year-old grandson—L.L. and N.L.'s cousin—described multiple instances in which he believed Mrs. Powell used unusually excessive physical force in disciplining L.L. (Aug. 15, 2011 Tr. at 65-70, 87, 88-91, 94-99). He testified to telling the CASA/GAL, Stephanie Stephan, that L.L. might be in danger at the Powells' home. (*Id.* at 91). He also testified that he believes Mrs. Powell loves N.L. but not L.L., and that he heard Mrs. Powell say she wanted N.L. but not L.L. (*Id.* at 71). He testified that he does not feel safe at the Powells' home. (*Id.* at 72, 77-79, 86).

**{¶13}** The trial court also relied on the testimony of Sandy Butler, in whose home L.L. was placed for almost a year and N.L. was placed for two days. (*Id.* at 129-130). Ms. Butler testified that she observed Mrs. Powell "wailing" on her two grandchildren sometime in May or June 2009 in the children's services parking lot while Ms. Butler and Mrs. Powell met so that Mrs. Powell could pick L.L. up for a transitional visit. (*Id.* at 138-139, 141-142). Describing the incident, Ms. Butler testified that Mrs. Powell was "hitting them in the head, arms, whatever she could," "probably ten times." (*Id.* at 138-139). Ms. Butler reported the incident to children's services. (*Id.* at 139).

**{¶14}** Ms. Butler described another instance that occurred sometime between May and July 2009 when the Powells dropped off L.L.—who had a fever of 104 degrees and was weak, lethargic, and partially immobile—after a transitional visit at the Powells' home. (*Id.* at 140, 142-143). According to Ms. Butler, the Powells were not taking L.L.'s condition seriously, so she rushed L.L. to the emergency room. (*Id.* at 140-141, 143-144). L.L. was given Tylenol there, and her condition improved. (*Id.*). Hospital personnel told Ms. Butler that L.L. could have begun seizing with such a high fever.[2] (*Id.* at 140). In October 2010, Bower requested that Ms. Butler meet her at a McDonald's to photograph L.L.'s scratched and bruised face. (*Id.* at 144-149). Bower told Ms. Butler that Mrs.

---

[2] The Ohio Rules of Evidence do not apply at dispositional hearings, so the trial court may admit hearsay evidence that is material and relevant. *In re Beebe*, 3d Dist. Allen No. 1-02-84, 2003-Ohio-1888, ¶ 10, citing Juv.R. 34(B)(2).

Powell told her that L.L.'s injuries occurred when L.L. fell down while visiting the Powells. (*Id.* at 148-149). Ms. Butler gave the photograph of L.L.'s face to children's services. (*Id.* at 145, 148).

{¶15} The trial court also based its decision on the testimony of Kim Freytag-Shope. She is the program manager at CASA/GAL of Hancock County. (*Id.* at 155). She described a visit to the Powells' home during which Mrs. Powell became inappropriately hostile toward and harshly raised her voice at Ms. Stephan in the presence of L.L. and N.L. after Ms. Stephan suggested that Bower's visitation be expanded to include Sundays. (*Id.* at 161-164, 172-173). Ms. Freytag-Shope also testified that Mrs. Powell offered a suspicious explanation of how N.L. sustained a bruise on her ear. (*Id.* at 159-160, 173-174).

{¶16} Ms. Stephan also offered testimony regarding that visit to the Powells' home. She testified that Mrs. Powell was verbally abusive and yelled and screamed at her. (*Id.* at 29-31). Ms. Stephan testified that she observed N.L.'s bruised ear and heard Mrs. Powell's suspicious explanation for it. (*Id.* at 12-15, 39). On another occasion when N.L. sustained a similar bruise on her other ear, Ms. Stephan testified that Mrs. Powell blamed it on Bower. (*Id.* at 39). Ms. Stephan testified to instances where it appeared to her that the Powells were leaving L.L. and N.L. unsupervised. (*Id.* at 16-17). During one unannounced visit conducted by Ms. Stephan and her coworker, Scott Thompson, Mrs. Powell

obstructed Ms. Stephan's ability to observe the children and was yelling and screaming at her and Mr. Thompson in the children's presence. (*Id.* at 16-18, 36-37).

{¶17} Another basis for the trial court's findings was the Powells' commission of "numerous violations of Harmony House rules during their visits with the children." (L.L. Doc. No. 113); (N.L. Doc. No. 99). Harmony House supervises visitations and exchanges. (Sept. 30, 2011 Tr. at 119). Admitted at the hearing was an exhibit containing Harmony House observation reports documenting the Powells supervised visits with L.L. and N.L. (*Id.* at 165, Powell Ex. C). The observation reports document violations of the Harmony House rules by the Powells, including their "inappropriate conversations," "inspecting" the children for injuries, and "demean[ing] others in the presence" of the children. (Powell Ex. C). The Harmony House case manager described some of these violations. (Sept. 30, 2011 Tr. at 139-141, 144-148, 155, 162).

{¶18} Based on these facts—some of which arose since the trial court's original dispositional order, and some of which appear to have been unknown to the trial court at the time of that order—we conclude that the trial court did not abuse its discretion in finding a change in the circumstances of L.L. and N.L.

warranting a change in custody.[3]  *See In re L.M.*, 2011-Ohio-3285, at ¶ 15.  Its finding is not against the manifest weight of the evidence because it is supported by competent, credible evidence demonstrating that the Powells created, at least to some degree, a neglectful, hostile, and abusive atmosphere in their home.  The record reflects the testimony of several witnesses, many of whom we recognize disagreed as to the parenting abilities of the Powells.  The trial court had the opportunity to observe the witnesses and weigh their credibility, and a reviewing court cannot simply substitute its opinion for that of the trial court.  *In re K.R.*, 2d Dist. Clark No. 2011 CA 39, 2011-Ohio-5694, ¶ 14.  The trial court did not abuse its discretion in making its change-in-circumstances finding.

**{¶19}** We next review the trial court's finding that granting legal custody of L.L. and N.L. to Bower was necessary to serve the best interest of L.L. and N.L.—the other finding required by R.C. 2151.42(B) to modify a R.C. 2151.353(A)(3) dispositional order.  R.C. 2151.353 and 2151.42 do not provide factors that a trial court should consider in determining what is in the best interest of a child.  *See In re L.P.*, 3d Dist. Seneca Nos. 13-12-60 and 13-12-61, 2013-Ohio-2607, ¶ 22; R.C.

---

[3] Another basis for the trial court's change-in-circumstances finding was the Powells "permitt[ing] contact between the children and their father, [William] against court orders." (L.L. Doc. No. 113); (N.L. Doc. No. 99).  Ms. Stephan testified that she is aware of at least one instance in which the Powells permitted the children to be in contact with William, following his release from prison. (Aug. 15, 2011 Tr. at 31-33); (Stephan Aff. ¶ 8, L.L. Doc. No. 68, attached); (Stephan Aff. ¶ 8, N.L. Doc. No. 56, attached).  The record reflects that William was removed from the case plan based on his incarceration. (Judgment Entry, L.L. Doc. No. 42, adopting Feb. 11, 2010 Amended Case Plan, N.L. Doc. No. 40); (Judgment Entry, N.L. Doc. No. 28, adopting Feb. 11, 2010 Amended Case Plan, N.L. Doc. No. 26).  However, this Court's review of the record did not reveal a prohibition of contact between William and L.L. and N.L., and the parties do not direct us to any.  We therefore do not rely on this basis in concluding that the trial court did not abuse its discretion in finding a change in the circumstances of the children.

2151.42. While not specifically required, when making a best-interest determination under R.C. 2151.353(A)(3) or 2151.42, a trial court may be guided by the factors listed in R.C. 3109.04(F)(1) or 2151.414(D). *See In re L.P.* at ¶ 22 (citations omitted).

{¶20} In this case, it does not appear from the trial court's decision that it relied on any factors in particular; however, it is clear that the trial court made the necessary best-interest finding under R.C. 2151.42(B). (L.L. Doc. No. 113); (N.L. Doc. No. 99). Because the trial court's finding is supported by some competent, credible evidence, we conclude that it is not against the manifest weight of the evidence, and that the trial court did not abuse its discretion.

{¶21} Much of the testimony and evidence cited above supports the trial court's finding that it was in L.L. and N.L.'s best interest to terminate the Powells' custody. Ms. Stephan testified consistently that she believed it was not in L.L. and N.L.'s best interest to be placed with the Powells, in part because of the "safety risk" that arrangement posed to the children. (Aug. 15, 2011 Tr. at 13); (Dec. 22, 2011 Tr. at 153-154, 157, 169). (*See also* Dec. 20, 2011 CASA/GAL Report and Recommendations, L.L. Doc. No. 86); (Dec. 20, 2011 CASA/GAL Report and Recommendations, N.L. Doc. No. 74). We recognize, however, that simply because placement with the Powells was not in L.L. and N.L.'s best interest, it

does not necessarily follow that giving Bower custody was necessary to serve L.L. and N.L.'s best interest.

**{¶22}** In August 2011, Ms. Stephan testified that she believed it was in the best interest of L.L. and N.L. that they be in Bower's custody. (Aug. 15, 2011 Tr. at 24). (*See also* Aug. 11, 2011 CASA/GAL Report and Recommendations, L.L. Doc. No. 77); (Aug. 11, 2011 CASA/GAL Report and Recommendations, N.L. Doc. No. 65). By December 2011, Bower had been evicted from her apartment and temporarily moved her family into her brother's house. (Dec. 22, 2011 Tr. at 149-151). Bower's changing housing situation, her dishonesty, and other concerns prompted Ms. Stephan to file an updated Report and Recommendations on December 20, 2011, in which she recommended that L.L. and N.L. be placed in a foster home. (L.L. Doc. No. 86); (N.L. Doc. No. 74). At the hearing on December 22, 2011, Ms. Stephan testified that if Bower's housing situation became more certain, then Ms. Stephan's concerns would be alleviated, and she would recommend that L.L. and N.L. remain with Bower, although that recommendation was not "concrete." (Dec. 22, 2011 Tr. at 151, 153-154, 166-167).

**{¶23}** Ms. Stephan testified that during every visit to Bower's home since the trial court returned temporary custody to her, Bower was attentive to L.L. and N.L., playing with them and doing their hair, for example. (Aug. 15, 2011 Tr. at

22-24). Bower's live-in boyfriend has also been attentive to L.L. and N.L., "very involved in playing and teaching them." (*Id.* at 24-25). While Ms. Stephan acknowledged that Bower's home initially needed cleaning and organized, it was still livable and not so bad as to warrant L.L. and N.L.'s removal from the home. (*Id.* at 25-26). Every time Ms. Stephan requested that Bower remedy certain conditions in her home, Bower did exactly as Ms. Stephan requested. (*Id.* at 57-58). Ms. Stephan noticed during her unannounced visits in the latter half of 2011 that Bower's home was cleaner and more organized, that Bower "had a system in place," and that Bower was implementing things she learned in her parenting classes, such as the use of behavioral charts. (Dec. 22, 2011 Tr. at 153, 159).

{¶24} On the other hand, a caseworker for Hancock County Job and Family Services, Mark Olthouse, testified that he was concerned for L.L. and N.L.'s safety and well-being when the trial court issued its July 7, 2011 judgment entry ex parte, removing L.L. and N.L. from the Powells' custody and designating Bower as temporary custodian. (Nov. 21, 2011 Tr. at 66). (*See also* L.L. Doc. No. 69); (N.L. Doc. No. 57). Mr. Olthouse testified that Bower had a history of not cooperating with his agency. (Nov. 21, 2011 Tr. at 59-60, 66-67). On July 8, 2011—the day after the trial court granted Bower temporary custody ex parte— Mr. Olthouse conducted an unannounced visit of Bower's home. (*Id.* at 60-61). Mr. Olthouse testified that L.L. and N.L. looked like they had "been through the

mill," and that "the home was a mess." (*Id.*) Mr. Olthouse testified that he visited Bower's home again approximately three weeks later, and the condition of the home had not improved, but the children were clean. (*Id.* at 68-69). He had concerns with L.L. and N.L. remaining in Bowers' custody, and he had fewer concerns with them returning to the Powells' home. (*Id.* at 84-87).

{¶25} By the conclusion of the final day of hearing, the trial court said, quite aptly, that "we've got a real complicated situation here." (Dec. 22, 2011 Tr. at 172). This is not an easy case. Few like this are. Our role is to determine whether the trial court abused its discretion in making its decision, not to supplant the trial court's decision with our own. *See In re T.J.*, 2010-Ohio-4191, at ¶ 14; *In re C.W.*, 2010-Ohio-2157, at ¶ 11. If the trial court's decision "is supported by competent, credible evidence," then it is not against the manifest weight of the evidence, and we must affirm. *In re C.W.* at ¶ 11.

{¶26} We recognize that Bower is not a model of parental fitness. Nor are the Powells. Faced with a difficult decision, the trial court considered the competing testimony and evidence and concluded that granting Bower custody was necessary to serve the best interest of L.L. and N.L. We conclude that this decision was supported by competent, credible evidence. Evidence in the record suggests that Bower was improving as a parent and custodian. She was attentive to her children. She gradually improved the conditions of her home in the latter

half of 2011. Though the record contains far from strong evidence in support of a finding that custody with Bower is necessary to serve L.L. and N.L.'s best interest, it is competent, credible evidence nonetheless. The trial court did not abuse its discretion in making its best-interest finding.

{¶27} The Powells argue that our recognition in *Osberry* that "an adjudication of neglect or dependency implies parental unfitness" forecloses a trial court from later finding, under R.C. 2151.42(B), that returning a child to his or her previously unfit parent is necessary to serve the child's best interest. 2003-Ohio-5462, at ¶ 9. We disagree. A previous, implied determination of parental unfitness via a dependency adjudication does not foreclose a trial court from transferring custody to a previously unfit parent if subsequent placement with the parent satisfies the R.C. 2151.42(B) standard—in other words, if "a change has occurred in the circumstances of the child or the person who was granted legal custody" and if "modification or termination of the [original dispositional] order is necessary to serve the best interest of the child." R.C. 2151.42(B). As the Powells themselves argue, this case is governed by the standard set forth in R.C. 2151.42. It is not governed by the trial court's previous dependency adjudication.

{¶28} Finally, the Powells argue that the trial court applied a reunification standard rather than R.C. 2151.42. In its January 9, 2012 judgment entries, the trial court found that granting custody of L.L. and N.L. to Bower was in the

children's best interest. (L.L. Doc. 89); (N.L. Doc. 77). The Powells appealed those entries, and we reversed and remanded because the trial court failed to find a change in circumstances. *In re L.L.*, 2012-Ohio-4346, at ¶ 36-37. On remand, the trial court issued its judgment entries nunc pro tunc, in which it noted that it previously made a change-in-circumstances finding but "failed to note its finding" in its January 9, 2012 judgment entries. (L.L. Doc. No. 113); (N.L. Doc. No. 99). Judging by the trial court's statements in its judgment entries nunc pro tunc, it made the required change-in-circumstances and best-interest findings but failed to note its change-in-circumstances finding in its January 9, 2012 judgment entries. (*Id.*); (*Id.*). Such an "omission," as the trial court described it, does not in itself suggest that the trial court applied a reunification standard rather than R.C. 2151.42. (*Id.*); (*Id.*).

{¶29} Furthermore, the trial court said in its judgment entries nunc pro tunc that its orders were made under R.C. 2151.42(B):

> This order is made pursuant to ORC 2151.42 (B) [sic] with an express finding that facts that have arisen since the order of custody was issued that [sic] a change has occurred in the circumstances of the children and [sic] that termination of the order is necessary to serve the best interest of the children. (L.L. Doc. No. 113); (N.L. Doc. No. 99).

The trial court therefore applied the standard found in R.C. 2151.42, and we concluded above that it did not abuse its discretion in making its change-in-circumstances and best-interest findings. Ms. Stephen's testimony cited by the Powells—in which she said, "our goal is to reunify children with their parents if it's possible"—is taken out of context and irrelevant. (Aug. 15, 2011 Tr. at 41). The "reunification" of parents and children and R.C. 2151.42 are not mutually exclusive.

{¶30} The Powells' assignment of error is therefore overruled.

{¶31} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

**/jlr**

**ROGERS, J., concurring separately.**

{¶32} I concur with the result reached by the majority. However, I write separately to comment on what I believe to be a misnomer in the terminology used by the majority when referring to the trial court's judgment entries of November 15, 2012. The majority has referred to the entries as nunc pro tunc entries, but I do not believe that the record in this matter supports such a description.

Case No. 5-12-38, 5-12-39

{¶33} The Tenth District has previously described a nunc pro tunc entry as follows:

> The purpose of a nunc pro tunc entry is to have the judgment of the court reflect its true action. A nunc pro tunc can be exercised only to supply omissions in the exercise of functions which are merely clerical. It is not made to show what the court might or should have decided, or intended to decide, but what it actually did decide.

(Internal citations omitted.) *Fed. Home Loan Mtge. Corp. v. LeMasters*, 10th Dist. Franklin No. 07AP-420, 2008-Ohio-4371, ¶ 16. We have subsequently defined the proper contours of a nunc pro tunc entry as follows:

> A trial court retains jurisdiction to correct clerical errors in judgment entries. *State v. Powell,* 3d Dist. Mercer No. 10-07-12, 2008-Ohio-1012, ¶ 8, citing *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 2006-Ohio-5795, ¶ 19; Crim.R. 36. "The term 'clerical mistake' refers to a mistake or omission, mechanical in nature and apparent on the record, which does not involve a legal decision or judgment." *Cruzado* at ¶ 19. A nunc pro tunc entry is the procedure used to correct clerical errors in a judgment entry, but the entry does not extend the time for which to file an appeal, as it relates back to the original judgment entry. *Gold Touch, Inc. v. TJS Lab, Inc.* , 130 Ohio App.3d 106, 109 (8th Dist. 1998); *Roth v. Roth* , 65 Ohio App.3d 768, 771-72 (6th Dist. 1989); *State v. Shamaly,* 8th Dist. Cuyahoga No. 88409, 2007-Ohio-3409, fn. 1. Just because the trial court refers to an entry as nunc pro tunc does not make it so established. *State v. Hopkins*, 3d Dist. Shelby No. 17-08-01, 2008-Ohio-2611, ¶ 14. "The mislabeling of [an] order does not void its otherwise finality[.]" *Shamaly* at ¶ 8.

*State v. Yeaples*, 180 Ohio App.3d 720, 2009-Ohio-184, ¶ 15 (3d Dist.).

{¶34} The trial court has labeled its latest judgment entries, dated November 15, 2012, as nunc pro tunc entries. In both entries, the trial court stated

-25-

that the "purpose of this 'Judgment Entry Nunc Pro Tunc' is to correct an omission in the court's previous judgment entry dated January 8, 2012 wherein the court failed to note its finding that there had been a change of circumstances since the court's original award of legal custody." But, there is nothing in the record of this case to demonstrate that the trial court actually made a finding of a change of circumstances prior to issuing its entries of January 8, 2012. This court reversed those judgments specifically because of that omission. If it is not in the record, it did not happen and it is not the trial court's prerogative to use a nunc pro tunc entry to accomplish something that it failed to do previously. Accordingly, the November 8, 2012 judgment entries were not nunc pro tunc entries.

{¶35} As the majority stated, a nunc pro tunc entry normally relates back to the date of the original entry. This is undeniably true because nunc pro tunc entries are intended to correct a previous entry by either adding something that actually occurred but was omitted from the previous entry or revising something that was misstated in the previous entry. Nevertheless, the trial court failed to adequately consider these principles when it described its November 15, 2012 entries as nunc pro tunc entries. And, we should remedy the trial court's mistake by pointing out that the entries were incorrectly labeled. Doing so would leave no question as to whether this matter was timely appealed, and would render the majority's discussion of this issue unnecessary.

-26-

**{¶36}** This is not to say that the current entries are improper, except for their labels. The trial court in this case had heard all the evidence and the arguments of the parties. It was entitled to review that evidence and its notes and make additional findings as it deemed appropriate. That procedure was reasonable under the circumstances of this case. Or, if the trial court felt it did not have sufficient evidence before it to make the necessary finding, it could have allowed the parties to present additional evidence. It appears that in this case the trial court felt it had sufficient evidence before it to make the necessary finding. It may have even felt that it had reached a conclusion on the necessary finding before preparing the original entry. However, if the necessary finding was not stated on the record, or included in some entry, it was not made.

**{¶37}** We see this result more frequently than we would like in criminal cases. For instance, a trial court often fails to state on the record that it intended to impose court costs on a defendant. *E.g.*, *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1066, ¶ 109. We consistently remand such cases for the re-imposition of court costs in open court, even though the imposition of court costs is a normal event in a criminal case. Just because the trial court could have, should have, and/or probably intended to impose court costs is insufficient to accomplish that result. The omission may not be corrected by a nunc pro tunc entry. On the other hand, if the trial court in fact stated that court costs were

imposed, but failed to include that imposition in the sentencing entry, it is entirely proper for the trial court to correct the omission by a nunc pro tunc entry. The same reasoning and handling of this issue should apply here.

**{¶38}** Because the trial court inaccurately described the appealed entries of November 15, 2012 as not nunc pro tunc entries, I concur separately.

/jlr