[Cite as *In re G.H.*, 2016-Ohio-1188.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| G.H., | : | No. 15AP-752<br>(C.P.C. No. 11JU10-13966) |
| (Franklin County Children Services, | : | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on March 22, 2016

**On brief:** *Robert J. McClaren*, for appellant Franklin County Children Services.

**On brief:** *Farlow & Associates, LLC*, and *Christopher L. Trolinger*, for appellee A.H.

**On brief:** *William T. Cramer*, for appellee J.A.W.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch.

KLATT, J.

{¶ 1} Appellant, Franklin County Children Services ("FCCS"), appeals a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which denied FCCS' motion for permanent custody of G.H. and granted legal custody of G.H. to his father, appellee A.H. For the following reasons, we affirm that judgment.

{¶ 2} G.H. was born on September 19, 2009 to A.H. and J.A.W., an unmarried couple. Initially, G.H. lived with his mother, J.A.W., and his half-brother, D.A., at his

maternal grandmother's home in northern Virginia.[1]  A.H. lived in the same area, but not with J.A.W., D.A., and G.H.  In early 2010, J.A.W. moved to Columbus, Ohio, taking D.A. and G.H. with her.

{¶ 3}    In November 2010, J.A.W. approached FCCS seeking assistance.  She had resorted to stealing to provide for her sons, and she was suffering from anxiety and depression.  FCCS and J.A.W. entered into a voluntary custody agreement, under which FCCS temporarily cared for D.A. and G.H. while working with J.A.W. so she could resume care of her children.  FCCS returned the children to J.A.W.'s care after a short period.

{¶ 4}    In April 2011, J.A.W. contacted A.H. and asked him to help her and the children move back to Virginia.  J.A.W. wanted to leave Ohio because "[t]hings just got really bad" between her and her then boyfriend.  (Aug. 19, 2014 Tr. 58.)  A.H. assisted J.A.W. with the move.

{¶ 5}    J.A.W.'s sojourn in Virginia lasted only two weeks.  When J.A.W. announced she was returning to Ohio, A.H. asked her to leave G.H. with him.  J.A.W. refused.  She and the boys took a bus back to Ohio, and upon arriving in Columbus, J.A.W. went to FCCS' offices and demanded that FCCS take custody of her children.  FCCS again entered into a voluntary custody agreement with J.A.W. and assumed custody of D.A. and G.H.

{¶ 6}    In May 2011, FCCS filed complaints seeking to have D.A. and G.H. adjudicated dependent children.  The complaints stated that the voluntary custody agreement was expiring, but J.A.W. was not in a position to adequately parent her children.  J.A.W. suffered from untreated alcohol addiction and mental illness, lacked stable housing, and engaged in physically violent confrontations with her boyfriend.  The juvenile court found that D.A. and G.H. were dependent children, and it granted FCCS temporary custody of both children.  FCCS placed D.A. and G.H. in foster care.

{¶ 7}    On January 5, 2012, FCCS transferred G.H. from foster care to his father's home.  After G.H. arrived in Virginia, he developed purpura, which caused severe pain in G.H.'s legs and a rash.  G.H. spent approximately two days in the hospital while medical personnel tested and treated him.  Soon thereafter, A.H's father informed A.H. that he had only six months to live.  A.H. visited his father and found him in poor health.

---

[1]  G.H. and D.A. have different fathers. D.A. was born on December 10, 2007.

Additionally, during this time, A.H. was suffering from a bad reaction to the medication he was taking to control his anxiety and depression. Rather than improving his mental health, the medication was causing him to feel agitated and more depressed.

{¶ 8} On April 13, 2012, a Virginia children service's caseworker arrived at A.H.'s home for a review. The caseworker asked A.H. if he was suicidal, and A.H. answered affirmatively. The caseworker called the police, which angered A.H. and caused him to "bl[o]w up on the cops." (May 4, 2015 Tr. 55.) A.H. wrestled with the police officers called to his home, and he was arrested. Although G.H. was in the home during this incident, he did not witness it. Ultimately, A.H. was convicted of obstruction of justice, a misdemeanor, and served six months in jail. After the incident, FCCS removed G.H. from A.H.'s home and returned him to foster care.

{¶ 9} On September 12, 2012, FCCS moved for permanent custody of D.A. and G.H. By that point, D.A. and G.H. had been in FCCS' custody for over 12 months of a consecutive 22-month period. With regard to J.A.W., the motion stated:

> [M]other, [J.A.W.,] has failed to make any significant progress in her case plan objectives. Mother has severe chemical dependency issues she has failed to address. Despite recommendations for inpatient treatment, Mother refuses to complete any long-term drug and alcohol treatment. Mother completed a 30-day inpatient treatment program, but she was subsequently found with alcohol in her home and admitted to drinking. Mother has failed to link with a psychiatrist for her mental health issues. Mother has completed only 17 out of 29 drug screens, with 9 being positive for marijuana and 2 for methadone. She has not completed a drug screen since May 21, 2012. She has also failed to complete anger management counseling.

(FCCS' Motion for Permanent Custody, at 4-5.) Additionally, the motion noted that A.H. was then in a Virginia jail.

{¶ 10} A.H. contested FCCS' motion for permanent custody. Additionally, A.H. filed a motion asking the juvenile court to terminate FCCS' temporary custody and award him legal custody of G.H.

{¶ 11} On various days beginning August 19, 2014 and ending May 26, 2015, the juvenile court held a hearing on FCCS' motion for permanent custody and A.H.'s motion for legal custody. On November 13, 2014, the juvenile court continued the hearing so that

FCCS could request and obtain a home study of A.H.'s home. Unfortunately, A.H. did not have settled housing from November 2014 to March 2015. In late October 2014, A.H. secured higher-paying employment with Sundance Electrical doing residential and commercial electrical work. To live closer to his workplace, A.H. planned to move himself and his family to an apartment located in his in-law's basement. However, the first night that A.H., his wife, and his daughter slept at his in-law's house, they discovered that the basement apartment was infested with bedbugs. A.H. and his family decamped to an extended-stay motel, where they resided for three weeks. They then moved to an apartment that they sublet for two months. Finally, on March 7, 2015, A.H.'s family settled into a two-bedroom apartment for which A.H. signed a 15-month lease. Due to the fluidity of A.H.'s housing situation, the Virginia children services agency could not complete a home study of A.H.'s home.

{¶ 12} Throughout the custody hearing, multiple witnesses testified to the strong bond between D.A. and G.H. For most of their young lives, the two boys have lived together, and, by all accounts, they share a close relationship. The brothers' guardian ad litem and an FCCS caseworker assigned to the brothers recommended that FCCS receive permanent custody of both boys so D.A. and G.H. could be adopted together, thus preserving their bond.

{¶ 13} During A.H.'s May 4, 2015 testimony, he indicated that he was willing to accept custody of both boys. A.H. acknowledged that he was not D.A.'s biological father, but he explained that he had developed a relationship with D.A. At the conclusion of the May 4, 2015 testimony, the juvenile court awarded A.H. temporary custody of both D.A. and G.H.

{¶ 14} While ideal for the boys, the placement proved unsuccessful. A.H. could not handle caring for both children, so he returned D.A. to FCCS' custody. A.H. maintained custody of G.H.

{¶ 15} In a decision and judgment entry rendered July 13, 2015, the juvenile court denied FCCS' motion for permanent custody of G.H. and granted A.H.'s motion for legal custody of G.H.[2] FCCS now appeals that judgment, and it assigns the following error:

---

[2] In a separate decision and judgment entry, the juvenile court awarded FCCS permanent custody of D.A. While J.A.W. wanted custody of her son, the juvenile court found that J.A.W. could not provide D.A. with a legally secure permanent home. D.A.'s father did not seek custody of him.

FCCS proved by clear and convincing evidence that permanent custody is in the best interests of the child. The trial court's judgment denying the motion for permanent custody is not supported by sufficient competent and credible evidence. Therefore, the decision of the trial court denying FCCS' motion for permanent custody and granting legal custody of G.H. to A.H. is against the manifest weight of the evidence.

{¶ 16} R.C. 2151.414 establishes the two-part test a juvenile court must apply when ruling on a motion by a public children services agency for permanent custody of a child. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 12; *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 9. A juvenile court may grant permanent custody of a child to a public children services agency if, after a hearing, it determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exist and (2) such relief is in the best interest of the child. R.C. 2151.414(B)(1). The circumstances enumerated in R.C. 2151.414(B)(1) are:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 17} Once a juvenile court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then decide whether a grant of permanent custody is in the best interest of the child. Pursuant to R.C. 2151.414(D)(1), to make this decision, the

juvenile court must "consider all relevant factors, including, but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 18} In the case at bar, the juvenile court also had before it A.H.'s motion to terminate FCCS' temporary custody of G.H. and award him legal custody of G.H. Generally, any party to a custody proceeding may, at any time, request that the juvenile court modify or terminate a previously entered order of disposition. R.C. 2151.353(F)(2); R.C. 2151.417(B).[3] The court must hold a hearing on the motion and, if applicable, comply with R.C. 2151.42. R.C. 2151.353(F)(2); R.C. 2151.417(B). Pursuant to R.C. 2151.42(A), at the hearing to modify or terminate an order of disposition, "the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child." R.C. 2151.42(A) does not provide factors that a juvenile court must consider in weighing the child's best interest. In the absence of specified factors, a juvenile court may rely on the best-interest factors listed in R.C. 2151.414(D). *In re N.L.*, 3d Dist. No. 5-12-38, 2013-Ohio-3983, ¶ 19; *accord In re J.A.*, 9th Dist. No. 24134, 2008-Ohio-3635, ¶ 9 ("The best interest factors of R.C. 2151.414(D) are not only relevant to the

---

[3] Previously, the juvenile court had found G.H. to be a dependent child, and it issued a dispositional order placing G.H. in FCCS' temporary custody. A.H.'s motion sought to terminate that dispositional order.

question of permanent custody, but also provide appropriate guidance in determining whether a grant of legal custody is in the best interest of the child.").

{¶ 19} There is one significant difference between applying the R.C. 2151.414(D) factors for purposes of granting legal custody as opposed to permanent custody. In determining whether to grant permanent custody, a juvenile court must find that clear and convincing evidence establishes that an award of permanent custody is in the child's best interest. R.C. 2151.414(B)(1). In determining whether to grant legal custody, a juvenile court instead applies the preponderance-of-the-evidence standard of review. *In re N.F.*, 10th Dist. No. 08AP-1038, 2009-Ohio-2986, ¶ 9.

{¶ 20} FCCS argues that the manifest weight of the evidence supports awarding it permanent custody of G.H., rather than the granting of legal custody to A.H. In reviewing whether the juvenile court's judgment is against the manifest weight of the evidence, an appellate court must make every reasonable presumption in favor of the judgment and the juvenile court's findings of fact. *In re A.B.*, 10th Dist. No. 15AP-105, 2015-Ohio-3849, ¶ 25. If the evidence is susceptible to more than one construction, an appellate court must give the evidence that interpretation which is consistent with the judgment. *Id.* With these precepts in mind, we must weigh the evidence and all reasonable inferences to determine whether the juvenile court " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *In re G.D.*, 10th Dist. No. 14AP-801, 2015-Ohio-1969, ¶ 28, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 21} Here, no one disputes that G.H. had been in FCCS' temporary custody for over 12 months of a consecutive 22-month period when FCCS moved for permanent custody. Thus, FCCS satisfied the first part of the two-part test that a juvenile court applies to decide whether to grant permanent custody of a child to a public children services agency. Consequently, the juvenile court's resolution of both FCCS' and A.H's motions turned upon its analysis of the R.C. 2151.414(D) factors.

{¶ 22} Pursuant to the first factor, found in R.C. 2151.414(D)(1)(a), the juvenile court considered G.H's interaction and interrelationship with his father, A.H., and his brother, D.A. With regard to A.H., the juvenile court concluded that G.H. has "interacted well with his Father and a bond has developed over time." (July 13, 2015 Decision and

Judgment Entry, at 5.)   FCCS argues that no bond exists between G.H. and A.H.  To support this argument, FCCS points to the paucity of contact between A.H. and G.H. from July 2013 to April 2015.  Our review of the record reveals no clear evidence regarding how many times G.H. and A.H. visited during the specified period.  However, it appears that, due to the distance between their homes, G.H. and A.H. probably visited together no more than four or five times per year.  Beginning in the summer of 2014, G.H. and A.H. interacted via Skype approximately once a week.

{¶ 23} Despite the relatively limited contact between father and son, A.H. testified that G.H. was always excited and joyful to see him, whether in person or on the computer.  An FCCS caseworker who had observed G.H. and A.H. together testified that G.H. enjoyed his father's company, and that G.H. and A.H. were both excited to see each other.  Additionally, both A.H. and his mother testified that A.H. and G.H. had established a bond.  Given this evidence, we conclude that the manifest weight of the evidence supports the juvenile court's conclusion that a bond between A.H. and G.H. has developed over time.

{¶ 24} With regard to D.A., the juvenile court found that the brothers share a close bond.   On appeal, FCCS argues that this bond militates in favor of awarding FCCS permanent custody of both D.A. and G.H. so FCCS can place the boys in the same adoptive home.  However, as the juvenile court found, the flaw in this argument is FCCS' inability to guarantee that D.A. and G.H. will be adopted together.  In response, FCCS argues that the juvenile court erred in even considering the likelihood of adoption.  We disagree.

{¶ 25} Although nothing in R.C. 2151.414(D) requires a juvenile court to consider the likelihood of adoption, a juvenile court may include that consideration in its analysis if the circumstances of a particular case render it a relevant. *In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51; *In re A.S.*, 10th Dist. No. 05AP-351, 2005-Ohio-5492, ¶ 6.   Here, the likelihood of adoption became relevant when an FCCS' caseworker assigned to the boys and the boys' guardian ad litem both advocated granting FCCS permanent custody of the brothers so they could remain together.  The juvenile court rejected the reasoning underlying these recommendations, pointing out that FCCS could

not guarantee placement of D.A. and G.H. in the same adoptive home. The juvenile court acted within its discretion in doing so.

{¶ 26} FCCS also criticizes the juvenile court for speculating regarding the probability of a single family adopting both boys. But, in fact, the FCCS caseworker and the guardian engaged in speculation by presuming that FCCS could keep D.A. and G.H. together. The juvenile court exposed that speculation by stating that a tandem adoption was not a guaranteed outcome, but rather, just a hope for the boys. In sum, we find no error in the juvenile court's analysis.

{¶ 27} Pursuant to the second factor, found in R.C. 2151.414(D)(1)(b), the juvenile court considered G.H.'s desire, as expressed through his guardian ad litem, to live with A.H. FCCS argues that the juvenile court erred in not considering the guardian ad litem's opinion that FCCS should receive permanent custody of G.H. We disagree. R.C. 2151.414(D)(1)(b) directs juvenile courts to consider "[t]he wishes of the child," not the opinion of the guardian ad litem. Moreover, a juvenile court need not follow the recommendation of the guardian ad litem. *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 54. We thus find no error occurred in the consideration of the second factor.

{¶ 28} Pursuant to the third factor, found in R.C. 2151.414(D)(1)(c), the juvenile court must consider the child's custodial history, including whether the child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period. FCCS first argues that the juvenile court did not include this factor in its analysis. This is incorrect. With regard to the third factor, the juvenile court stated:

> [G.H.] was initially taken into the custody of FCCS when the Magistrate granted a [temporary order of custody] on May 13, 2011 * * *. [G.H.] was adjudicated dependent and [temporary custody] was granted to FCCS on January 9, 2012, and he remained predominately in FCCS custody continuously until May 4, 2015 when the Court ordered temporary custody to his Father[, A.H.].

(July 13, 2015 Decision and Judgment Entry, at 6-7.) The juvenile court acknowledged elsewhere in its decision that, given the facts set forth above, G.H. had been in FCCS' temporary custody for over 12 months of a consecutive 22-month period.

{¶ 29} FCCS next argues that the juvenile court erred in not weighing the third factor in its favor. This argument wrongly assumes that, because the juvenile court awarded A.H. legal custody of G.H., the juvenile court must have determined that this factor favored such an outcome. We do not share FCCS' assumption. No one R.C. 2151.414(D)(1) factor has greater weight than any other factor. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. Consequently, one or more factors could favor FCCS, but the juvenile court could still decide not to award it permanent custody. We thus reject FCCS' conclusion that, given the ultimate outcome, the juvenile court must have weighed the third factor against it.

{¶ 30} With regard to the fourth factor, set forth in R.C. 2151.414(D)(1)(d), FCCS argues that the juvenile court erred in finding that A.H. could provide a secure permanent placement for G.H. First, FCCS asserts that A.H. cannot provide a permanent home for G.H. because A.H. has mental health issues, as shown through the 2012 incident that led to A.H.'s arrest, and A.H. has not obtained treatment for those issues. In addressing A.H.'s mental health, the juvenile court discussed the 2012 incident that led to A.H.'s arrest. The juvenile court concluded that the incident resulted from multiple factors, including a medication imbalance and the stress caused by A.H.'s father's diagnosis with a terminal illness.[4] The juvenile court also found that A.H. had not had an incident like that previously or since, and the factors that led to the incident had passed. Moreover, the juvenile court found that A.H. engages in mental health counseling. Based on these findings, the juvenile court tacitly determined that the 2012 incident and A.H.'s mental health did not preclude him from providing G.H. with a permanent home.

{¶ 31} FCCS disputes A.H.'s testimony that he receives psychological counseling once a week. Essentially, FCCS will not accept that A.H. attends counseling because he has refused to execute a release so that his counselor can discuss A.H.'s mental health with the agency. The juvenile court found A.H.'s testimony regarding his counseling credible, and the record shows no basis for questioning that assessment.

{¶ 32} FCCS also disparages the efficacy of A.H's counseling because, according to FCCS, A.H. had only been receiving counseling for a few weeks when the hearing

---

[4] Although not mentioned by the juvenile court, this list should also include the stress caused by G.H.'s bout of purpura.

concluded on May 26, 2015. However, A.H. testified that he sought out mental health counseling once he completed his six-month stint in jail for the 2012 incident. After A.H. resolved his housing situation in March 2015, he found and started seeing a new counselor. On April 2, 2015, A.H. testified that he had been attending counseling sessions with the new counselor for three weeks. A.H. was still seeing the same counselor when he testified on May 26, 2015. Consequently, the evidence does not support FCCS' characterization of A.H.'s mental health treatment.

{¶ 33} Next, FCCS argues that A.H. failed to demonstrate that he has stable housing. FCCS bases this argument on the series of moves A.H. and his family experienced from November 2014 to March 2015. Unlike FCCS, we do not infer instability from the changes in A.H.'s address. A.H. explained the reasons for the moves: a new job in a different city, bedbugs infesting the apartment where A.H. planned to reside, and a short-notice search for alternative housing. A.H. and his family now live in a two-bedroom apartment, for which A.H. signed a 15-month lease. Consequently, the evidence shows that A.H. has stable housing.[5]

{¶ 34} Finally, FCCS contends that A.H. cannot provide G.H. with a permanent home because he admittedly smokes marijuana on a weekly basis and has no plans to stop. Frankly, A.H.'s drug use is a serious concern. A.H. testified that he does not smoke in front of his children and he does not believe that his marijuana use lessens his parenting ability. Nevertheless, smoking marijuana is illegal (both in Ohio and Virginia) and impairs the user's judgment.

{¶ 35} Despite A.H.'s marijuana use, the juvenile court found multiple factors weighed in favor of placing G.H. in A.H.'s home: A.H. has adequate and appropriate housing, A.H. has the financial means to care for G.H., G.H. will share A.H.'s home with his step-mother and his half-sister, and G.H.'s maternal and paternal grandmothers live near A.H. and can assist A.H. with his parenting obligations. Weighing all the evidence, the juvenile court concluded that A.H. could provide a secure permanent placement for G.H.

---

[5] FCCS also argues that the Virginia children service agency's failure to approve A.H.'s home is evidence that A.H. cannot provide a secure permanent placement for G.H. We disagree. The Virginia children service agency did not approve A.H.'s home because it did not complete the home study. Thus, the lack of approval has no bearing on the adequacy of A.H.'s home.

{¶ 36} Our review of the record reveals evidence on both sides of the ledger. However, the evidence favoring A.H. is of such quantity and quality that we cannot conclude that the juvenile court lost its way and created a manifest injustice. The juvenile court had a sufficient evidentiary basis on which to conclude that A.H. could provide G.H. with a secure, permanent home.

{¶ 37} Finally, FCCS attacks the juvenile court's conclusion, set forth in its consideration of other relevant factors, that A.H. substantially completed his case management plan. Ultimately, assigning a degree to which A.H. completed his case management plan—whether substantially, partially, or minimally—is of little importance. The juvenile court considered the issues addressed in the case management plan, including A.H.'s mental health, housing, and drug use, in its consideration of the fourth factor. We have reviewed the juvenile court's consideration of each of those issues. We thus decline to resolve a quibble over the degree to which A.H. completed the case management plan.

{¶ 38} In the final analysis, the juvenile court "gave significant weight to the ability to be raised with a sibling and by [a] natural parent with other relatives that are available to assist [G.H.'s] transition" to A.H.'s home. (July 13, 2015 Decision and Judgment Entry, at 10.) FCCS would rather have had the juvenile court give greater weight to keeping G.H. and D.A. together. However, as the juvenile court pointed out, FCCS cannot guarantee the same adoptive home for both D.A. and G.H. On the other hand, the juvenile court could guarantee G.H.'s ongoing relationship with his father, half-sister, and extended maternal and paternal family by granting A.H. legal custody. Facing a difficult decision, the juvenile court determined that granting legal custody to A.H. was in G.H.'s best interest. The manifest weight of the evidence supports this determination.

{¶ 39} For the foregoing reasons, we overrule FCCS' sole assignment of error, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

TYACK and BRUNNER, JJ., concur.

———————————