[Cite as *In re A.B.*, 2015-Ohio-3849.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

In the Matter of:                               :

[A.B.],                                         :
                                                          **No. 15AP-105**
         Appellee,                              :        (C.P.C. No. 12JU-7610)

[D.B.,                                          :        **(ACCELERATED CALENDAR)**

         Appellant].                            :

In the Matter of:                               :

[T.R. et al.],                                  :
                                                          **No. 15AP-106**
         Appellees,                             :        (C.P.C. No. 13JU-896)

[D.B.,                                          :        **(ACCELERATED CALENDAR)**

         Appellant].                            :

D E C I S I O N

**Rendered on September 22, 2015**

*Robert J. McClaren*, for Franklin County Children Services.

*Jesse Atkins*, for appellant.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

LUPER SCHUSTER, J.

{¶ 1} Appellant, D.B., mother of A.B., T.R., and A.R. Jr. (collectively "the children"), appeals from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and

placing the children in the permanent custody of appellee, Franklin County Children Services ("FCCS").  For the following reasons, we affirm.

## I.  Facts and Procedural History

{¶ 2}   By way of background, this case involves FCCS's request for permanent custody of A.B., born November 11, 2001; T.R., born September 14, 2011; and A.R. Jr., born July 22, 2012.  R.C., the father of A.B., is incarcerated and has no interest in case participation and no potential for custody of A.B.   A.R., mother's boyfriend, has acknowledged paternity of A.R. Jr. and is alleged to be the father of T.R.  Additionally, A.R. has acted as a father-figure for A.B. as A.B. has never had a relationship with her biological father.

{¶ 3}   Though this case has been continually open since March 6, 2012, FCCS originally opened its case in 2011 regarding a delinquency charge related to mother's oldest son, S.H., who is now an adult.  During the previous opening, A.B. was removed from her mother's care for a period of 13 days while mother was incarcerated.  When the case reopened on March 6, 2012, FCCS received temporary custody of A.B. for a period of two days after A.B. failed to appear at a court hearing related to a violent assault on one of A.B.'s classmates.  FCCS returned A.B. to her mother after that two-day period.  However, on May 9, 2012, FCCS again received temporary custody of A.B., on the delinquency charge, after learning of allegations of sexual abuse and substance abuse by A.B.'s paternal uncle in her current living situation.

{¶ 4}   On June 1, 2012, FCCS filed a dependency complaint alleging A.B., who was ten years old at the time, to be a dependent minor.  FCCS filed the dependency action due to concerns regarding mother's housing and income, including concerns that A.B. was exposed to substance abuse and criminal activity in their current living situation.  The juvenile court found A.B. to be a dependent child on September 12, 2012 and granted temporary court commitment to FCCS.  The juvenile court adopted a case plan for mother to regain custody of A.B.  Following semi-annual reviews of the case, the juvenile court granted two subsequent extensions of temporary custody of A.B. on April 10 and October 1, 2013.

{¶ 5}   On January 22, 2013, FCCS filed a complaint alleging T.R. and A.R. Jr. to be abused, neglected, and/or dependent children and obtained emergency custody of T.R.

and A.R. Jr. At that time, T.R. was one year old and A.R. Jr. was six months old. The complaint stated the family was homeless and struggled to find suitable housing for the children despite receiving FCCS assistance in that regard. According to mother, FCCS removed the children from her custody after she was asked to leave a family shelter following an argument with another resident.

{¶ 6} FCCS then filed two separate motions requesting permanent custody of A.B., T.R., and A.R. Jr. The juvenile court combined both motions into a single trial.

{¶ 7} At the trial commencing December 10, 2014, A.B. testified during an in camera interview that she was worried about her siblings and herself and doubted her mother was able to take care of them. A.B. said her mother is "sick" and she thinks her mother is in denial and needs help. (15AP-105, Dec. 10, 2014 Tr. 34.) A.B. expressed a desire for FCCS to "proceed with the permanent custody" proceedings. (15AP-105, Dec. 10, 2014 Tr. 44.) A.B. said she was no longer attending visits with her mother because her mother told her via text message that she intended to "sign her rights away" to A.B. and only seek reunification with the two younger children. (15AP-105, Dec. 10, 2014 Tr. 48.) A.B. said she believed her mother was angry that A.B. preferred living in a foster home to living with her mother. The trial court did not conduct in camera interviews with T.R. and A.R. Jr. due to their young age.

{¶ 8} Mother testified at the trial regarding her current housing situation. Mother decided to move in with her mother in a retirement community that does not allow children, and mother stated she understood that her inability to obtain suitable housing was a barrier to her children returning to her custody. When asked where she would live if the children were returned to her custody, mother said she intended to live with her mother but agreed that was not a long-term solution since her mother's residence may not allow children to live in the community.

{¶ 9} Mother described the difficulty she has had finding independent housing. She said that, given her history of evictions and her poor credit report, she had not been able to find a housing option that was big enough for all the children and in a price range she could afford. In addition to her inability to find suitable housing, mother has not had a long-term job since 2011. Mother suffers from Graves disease and requires frequent medical care and medications, but she has lost her health insurance twice in the last two

years.  Her only source of income is child support.  Mother testified she currently had $500 available to her, which she estimated to be enough to put down one-half of a deposit for an apartment.

{¶ 10} Mother described an incident when the she hit A.R., the father of the two younger children, inside a taxi cab FCCS had provided to mother.  Additionally, mother spent 18 days in jail at the end of 2013 on a petty theft charge.  Although mother agreed she was referred for counseling and anger management, she testified that she did not believe she needed either counseling or anger management.  Mother admitted that she was not consistently attending her counseling appointments, sometimes going months without attending an appointment.  Although they previously participated in family counseling, mother said A.B. now refuses to attend requested family counseling sessions. Mother agreed that A.B. is not "close" to her "at all."  (15AP-105, Dec. 10, 2014 Tr. 163.)

{¶ 11} Van Frasher, a caseworker with FCCS, testified that mother had a housing issue in 2011 and that FCCS provided her with furniture, financial assistance, and helped her to create a budget.  In June 2012, mother informed FCCS that she intended to live in a shelter.  Frasher testified that FCCS was attempting to help mother obtain independent housing at that time, but when FCCS reopened its case in 2012, mother did not have independent housing.

{¶ 12} Sarah Terstage, the most recent FCCS caseworker assigned to mother, testified that FCCS again received custody of A.B. on June 5, 2012, and said there were issues of substance abuse, criminal charges against the father-figure, and problems with housing and income.  In January 2013, FCCS removed T.R. and A.R. Jr. from mother due to "ongoing problems with housing," the parents' struggle to "meet the basic needs of the children," and the fact that they were no longer able to reside in the shelter.  (15AP-105, Dec. 11, 2014 Tr. 117.)  The children have not returned to mother's custody.

{¶ 13} Terstage then described mother's case plan, which outlined the goals she needed to achieve in order to be reunified with her children. The case plan required mother to meet the basic needs of the children, provide documentation of income, comply with the rules of her probation, and attend medical appointments for herself.  The case plan further required mother to obtain and maintain safe and suitable housing, demonstrate appropriate conduct for the children, consistently attend her visitations with

the children, participate in any recommended parenting and home-based programs, comply with random drug screens and complete a drug and alcohol assessment should a drug screen reveal a problem, keep her appointments with FCCS, and complete a psychological evaluation. A.R. had a similar case plan to complete.

{¶ 14} Terstage testified that mother's biggest barriers to reunification with her children were her failures to obtain suitable housing and to attend her counseling sessions. Mother's current living situation in a senior citizen community living complex did not qualify as suitable housing under the case plan because it was not a place where the children would be allowed to reside with mother. According to Terstage, mother has never had safe and suitable housing for the children that mother has been able to independently obtain and maintain. Terstage said that mother talked to her on a weekly basis about looking for new housing and that it was mother's stated plan to acquire independent housing.

{¶ 15} On February 28, 2014, A.R. obtained an apartment on Rockcastle Avenue where he and mother intended to live. FCCS assisted mother financially by providing the first month's rent. However, mother and father were evicted from that property four months later due to their inability to pay their rent. Terstage said mother and father both had been laid off from their jobs and were struggling financially.

{¶ 16} Terstage told the juvenile court that FCCS referred mother to community service workers to assist her with housing, budgeting, and material assistance. Mother had been staying with family or friends and had moved around frequently. Since Terstage has been assigned to the case, mother has not utilized the housing resources of a shelter.

{¶ 17} Terstage spoke about the same domestic violence incident that mother described in her testimony, and Terstage explained that although mother had been successful in addressing her anger in her counseling session, mother was unable to use those anger management techniques she learned in counseling when interacting with father. Mother said she would not attend additional counseling sessions if she knew her children would not be returning to live with her.

{¶ 18} Mother completed a psychological evaluation as the case plan required. Following the psychological evaluation, mother was referred for counseling at Mid-Ohio. Although she was able to connect with a counselor, mother did not attend her sessions for

several months. Eventually, mother started counseling, but her participation and attendance were not consistent. Mother did have a past period where she consistently attended counseling; but, by the time of trial she had stopped attending her counseling sessions.

{¶ 19} Terstage testified that A.R. had a marijuana substance abuse problem. A.R. told Terstage he was not going to change his habits, and by the time of the trial he had moved to Colorado.

{¶ 20} Turning to the bonds between parent and child, Terstage said that all three children are bonded to both mother and father but that the relationship between A.B. and mother is strained, noting A.B.'s recent refusal to participate in family counseling. Both A.R. Jr. and T.R. are too young to understand the concepts of permanent custody and adoption.

{¶ 21} Michael Danchak, the children's guardian ad litem, testified that A.B.'s relationship with her mother is strained. Danchak noted that A.B. had previously expressed a desire to be reunified with her mother, but that as of December 3, 2014, A.B. no longer wanted to live with her mother. Danchak testified that the younger two children, T.R. and A.R. Jr., interact well with mother and are "always delighted" to see her. (15AP-105, Dec. 11, 2014 Tr. 212.) A.B. has been in many different foster homes since the case opened, often changing placement due to behavioral issues. A.B. has received mental health treatment several times during the pendency of this case. A.R. Jr. and T.R. have had several placements since entering the custody of FCCS. At the time of trial, all three children were placed together in the same foster home and have been there since August 21, 2014. According to Danchak, T.R. and A.R. Jr. are bonded to each other and bonded to A.B. Because they are so young, neither T.R. nor A.R. Jr. has the ability to express his or her wishes regarding permanent custody.

{¶ 22} Danchak said it was his recommendation that A.B.'s wishes be respected and that permanent custody "ought to be granted" to FCCS "regardless of housing." (15AP-105, Dec. 11, 2014 Tr. 220.) As to the two younger children, Danchak said he "would not have a problem returning" the children to mother and father "if they could provide housing and pay for the necessities," but that because the parents have shown a repeated inability to provide those things, he recommended granting the motion for

permanent custody to FCCS for A.R. Jr. and T.R. as well.  (15AP-105, Dec. 11, 2014 Tr. 220.)  Danchak specifically noted he did not believe one parent would be able to successfully provide housing and basic necessities to the children without the involvement and help of the other parent.

{¶ 23} Following the two-day trial, the juvenile court granted FCCS's motions requesting permanent custody of the children in a January 15, 2015 judgment entry. Mother timely appeals.  Although the appellate brief filed on behalf of mother purports to represent an appeal from both mother and father, father was represented by separate counsel at trial and did not file a separate notice of appeal.  Thus, we will treat this appeal as pertaining to mother only.

## II.  Assignment of Error

{¶ 24} Mother assigns the following error for our review:

> The lower court erred in granting permanent custody to the Franklin County Children Services because the agency failed to prove its case by clear and convincing evidence as required by R.C. Section 2151.414(B)(1) and the holding was not supported by the manifest weight of the evidence.

## III.  Standard of Review

{¶ 25} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.  " '[I]f the evidence is susceptible to more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 26} "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence."  *J.T.* at ¶ 8.  "Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody if after a hearing it determines, by clear and convincing evidence, that * * * such relief is in the best interest of the child."  *Id.* at ¶ 9.  "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be

established." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

## IV. Discussion

{¶ 27} In her sole assignment of error, mother asserts the juvenile court erred in granting permanent custody to FCCS. More specifically, mother argues the juvenile court erred when it determined the termination of her parental rights was in the best interest of the children.

{¶ 28} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 29} In deciding to award permanent custody, the trial court must take a two-step approach. *K.L.* at ¶ 18. The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* Here, there is no dispute that the children were in the temporary custody of one or more public children service agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d).

{¶ 30} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the trial court must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). In determining the best interest of a child, R.C. 2151.414(D)(1) directs that the trial court must consider all relevant factors including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C. 2151.413(D)(1)], the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 31} The juvenile court considered all of the above statutory factors with respect to each of the three children and concluded that an award of permanent custody was in the best interest of the children. Mother argues that although the juvenile court correctly determined factors (c) and (e), the juvenile court erred in its evaluation of factors (a), (b), and (d). Mother's argument is essentially a disagreement with the juvenile court's conclusions. We will address mother's arguments with respect to each of the statutory factors.

### A. R.C. 2151.414(D)(1)(a) – Parent, Child, and Sibling Interrelationships

{¶ 32} The juvenile court described the bond between A.B. and her mother as "a lost bond." (15AP-105, Jan. 15, 2015 Decision and Entry, 9.) Mother argues the juvenile

court did not consider the possibility that the tension in the relationship between mother and A.B. was a short-term issue caused by a fight the two had shortly before trial. Mother's argument in this regard, however, is speculative. Though there was testimony that she and A.B. had a fight either through text messages or social media, the juvenile court did not specifically state this was the basis for its finding that A.B. and mother had a "lost bond." The juvenile court, instead, noted that both mother and A.B. had their own versions of what was said during this fight, and noted mother's testimony that A.B.'s version of the fight was somewhat exaggerated.

{¶ 33} Notwithstanding the evidence concerning their recent fight, the overwhelming evidence presented to the juvenile court was that the relationship between A.B. and her mother was strained at best. The guardian ad litem, the FCCS caseworker, A.B., and mother herself all testified to this effect. Additionally, to the extent mother argues the trial court concluded that the bond between her and A.B. was a lost bond based solely on what could be a fleeting opinion of a teenager, the juvenile court expressly noted that A.B.'s "wish is only one factor considered by the Court in the decision on this Permanent Court Custody motion, and is not letting a thirteen year old child solely decide her fate for the next four and one-half years, until age eighteen." (15AP-105, Jan. 15, 2015 Decision and Entry, 6.)

{¶ 34} Mother next argues that the juvenile court erroneously determined that all three children are "very bonded" to their foster parents, asserting there was not enough evidence in the record for the juvenile court to make that finding. (15AP-105, Jan. 15, 2015 Decision and Entry, 9.) Again, however, the record indicates otherwise. A.B. testified regarding the positive relationship she has with her current foster parents, and the fact that A.B. views them as a prospective adoptive family and wishes to proceed with the permanent court commitment proceedings is clear and convincing evidence that A.B. feels very bonded to her foster parents.

{¶ 35} As to the two younger children, the juvenile court found that A.R. Jr. and T.R. are "bonded" to their biological parents but that they are "very bonded" to their foster parents. (15AP-105, Jan. 15, 2015 Decision and Entry, 9.) Danchak stated in his report that T.R., though too young to understand the question of whether she wanted to be reunited with her biological parents, "did express a desire to go back to the home of * * *

her [former] foster mother."  (15AP-106, Guardian Ad Litem's Report, 4.)  Additionally, Terstage noted in her semi-annual review of the case plan that both T.R. and A.R. Jr. had been with the same foster family for 15 months and that they are both "bonded with [the foster parents] and they are comfortable in the home."  (15AP-106, Semi-Annual Review, 6.)  Danchak's report states he interviewed Terstage and relied on her findings in formulating his recommendation.

{¶ 36} The evidence above relates to the bond that A.R. Jr. and T.R. had with their long-term foster parents with whom they resided for 15 months.  However, shortly before trial, A.R. Jr. and T.R. were placed in a new foster family along with A.B. so that all three siblings could be together.  Danchak noted that although the younger two children had only been in the new placement a relatively short amount of time compared to their previous placement, both A.R. Jr. and T.R. are "entirely comfortable" in their new placement and "they don't appear to be mal-adjusted children." (15AP-105, Dec. 10, 2014 Tr. 215.)  Even if we were to agree with mother that the juvenile court overstated the bond between the younger two children and their current foster parents, mother does not indicate how the overall best interest analysis would have been different had the juvenile court listed the bond between the children and the foster parents as "bonded" instead of "very bonded."

{¶ 37} Mother further argues the juvenile court erred when it determined the children are not bonded to relatives, asserting the children had good relationships with their maternal and paternal grandmothers, their cousin, and their half-brother.  However, none of the children are living with, or have plans to live with, any relatives, and there was no evidence before the juvenile court indicating that any relatives intended to provide any sort of support to the children.  Thus, even if the juvenile court erred in concluding that the children are not bonded with their relatives, mother does not explain how any such error would have impacted the overall best interest analysis.  *See generally In Matter of A.V.*, 10th Dist. No. 05AP-789, 2006-Ohio-3149, ¶ 35 (even assuming the trial court erred in limiting cross-examination of a witness, the appellant's failure to demonstrate a showing of prejudice renders the alleged error, "at most, harmless error").

**B.  R.C. 2151.414(D)(1)(b) – The Children's Wishes**

{¶ 38} Mother next argues the juvenile court erred in placing too much weight on A.B.'s expressed desire to proceed with the permanent custody proceedings.  According to mother, the juvenile court should have placed more weight on A.B.'s past statements expressing her desire to be reunified with her mother and should have discounted her more recent statements as an emotional outburst from a teenager.

{¶ 39} As we noted above in discussing the bond between A.B. and her mother, the evidence presented to the juvenile court was consistent that the two had a strained relationship.  Mother argues the juvenile court did not do enough to ensure that A.B.'s wishes were genuine, but the juvenile court expressly noted it would not place too much weight on A.B.'s expressed wishes in making such an important determination.  A.B. stated other reasons she desired to proceed with permanent custody beyond any fight she may have had with her mother: she was concerned for her own wellbeing, her mother's wellbeing, and the wellbeing of her younger siblings, and she feared she would have to take care of her younger siblings because her mother was unable to do so.  Additionally, though mother asserts the guardian ad litem's recommendation was uncertain, the juvenile court noted it relied heavily on Danchak's recommendation. Danchak visited with the children over 70 times throughout the course of this case and had ample opportunity to discern whether A.B.'s expressed wishes were genuine or, instead, were emotionally charged and fleeting.

{¶ 40} Mother notes that Danchak spoke favorably of the biological parents, so the juvenile court should have considered the guardian ad litem's recommendation to be more hesitant.  However, " 'if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks* at ¶ 59, quoting *Karches* at 19.  Though Danchak said he would have had no problem recommending the younger children be reunited with their parents should they be able to find appropriate long-term housing, he was clear that mother's inability to find and maintain housing showed that mother would not ever be able to create the kind of stable environment needed to care for her children.

### C.  R.C. 2151.414(D)(1)(d) – Need for Legally Secure Placement

{¶ 41} Finally, mother argues the juvenile court erred in determining the children cannot achieve a legally secure permanent placement without a grant of permanent custody to FCCS.  Mother argues the juvenile court placed too great of emphasis on her housing situation and ignored the fact that the she had complied with other aspects of her case plan.

{¶ 42} It was clear from the opening of this case that lack of stable housing was the biggest obstacle to mother regaining custody of her children.  The evidence before the juvenile court indicated that mother showed a repeated inability to either find or maintain suitable housing for herself or her children.  Mother argues FCCS indicated she was not required to have independent housing in order to satisfy her case plan, so her statement during trial that she would be willing to take the children to a shelter should have been sufficient to show that the children could achieve stability with her.  However, Terstage, the FCCS caseworker, testified that from the time FCCS had opened this case, mother had not availed herself of any family shelter resources.  Danchak also noted that mother would bounce around from place to place and seemed to show a lack of understanding that her inability to find stable and suitable housing for her children affected her ability to properly meet the basic needs of the children.  Indeed, mother herself testified that at the time of trial, she still did not have a suitable place for the children to live, and she had not been able to maintain stable housing for two years.  With regards to mother's homelessness, the she had ample time to take advantage of the resources of a family shelter in an effort to be reunified with her children, but she failed to do so and did not explain why she failed to do so.

{¶ 43} As the juvenile court noted in its decision, many families faced with permanent court commitment often suffer immense financial struggles.  However, as the juvenile court noted, mother in this case was unlike so many others faced with these circumstances because she did not also struggle with a debilitating mental illness, chemical abuse or dependency, or developmental disabilities, as is often the case.  Even still, however, mother showed what the juvenile court described as an "inept" ability to maintain a rental payment.  (15AP-105, Jan. 15, 2015 Decision and Entry, 4.)  FCCS sought two extensions of temporary custody before moving for permanent court

commitment, and yet mother was never able to show any progress in the area of providing stable housing for the children.  As the juvenile court noted, mother demonstrated that even when FCCS assisted her with rental payments, furniture, and case plan services, she was still unable to find any suitable housing options.  All parties, including mother, knew that suitable housing was the main focus of her case plan; her failure to even make progress in this regard is indicative of her inability to provide for the needs of her children.

{¶ 44} Mother also showed a reluctance or inability to comply with the counseling component of her case plan, and she was unable to translate any skills she had learned in her anger management counseling to real-world situations.  She also showed a disregard for the possible benefits of counseling, failing to attend many of her sessions and stating in her testimony that she would not continue counseling if she knew she would not be reunified with her children.  All of this evidence contributed to the juvenile court's finding that the children's need for a legally secure, permanent placement could not be met without a grant of permanent custody to FCCS.

{¶ 45} Based on all the testimony and evidence presented, including the entire case file, the trial court determined permanent custody is in the best interest of the three children.  Having reviewed the entire record, we conclude the trial court had clear and convincing evidence to conclude permanent court commitment was in the best interest of the children, and the trial court's decision was not against the manifest weight of the evidence.  Accordingly, we overrule mother's sole assignment of error.

## V.  Disposition

{¶ 46} Based on the forgoing reasons, clear and convincing evidence supports the award of permanent custody to FCCS, and the trial court's decision was not against the manifest weight of the evidence.  Having overruled mother's sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

KLATT and HORTON, JJ., concur.