[Cite as *In re D.A.*, 2016-Ohio-1187.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| | | No. 15AP-691 |
| D.A., | : | (C.P.C. No. 12JU01-1001) |
| (J.A.W., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

---

D E C I S I O N

Rendered on March 22, 2016

---

**On brief:** *William T. Cramer*, for appellant J.A.W.

**On brief:** *Farlow & Associates, LLC*, and *Christopher L. Trolinger*, for appellee A.H.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch.

KLATT, J.

{¶ 1} Appellant, J.A.W., appeals a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted appellee, Franklin County Children Services ("FCCS"), permanent custody of D.A., J.A.W.'s son. For the following reasons, we affirm that judgment.

{¶ 2} In November 2010, J.A.W. approached FCCS seeking assistance. She had resorted to stealing to provide for her two sons, D.A., born December 10, 2007, and G.H.,

born September 19, 2009.[1]  J.A.W. was also suffering from anxiety and depression.  FCCS and J.A.W. entered into a voluntary custody agreement, under which FCCS temporarily cared for D.A. and G.H. while working with J.A.W. so she could resume care of her children.  FCCS returned the children to J.A.W.'s care after a short period.

{¶ 3}  In April 2011, J.A.W. contacted G.H.'s father, A.H., and asked him to help her and the children move to Virginia, where A.H. lived.  J.A.W. wanted to leave Ohio because "[t]hings just got really bad" between her and her then boyfriend, R.W. (Aug. 19, 2014 Tr. 58.)  A.H. assisted J.A.W. with the move.

{¶ 4}  J.A.W.'s sojourn in Virginia lasted only two weeks.  She took a bus back to Ohio and, upon arriving in Columbus, went to FCCS' offices and demanded that FCCS take custody of her children.  FCCS again entered into a voluntary custody agreement with J.A.W. and assumed custody of D.A. and G.H.

{¶ 5}  In May 2011, FCCS filed complaints seeking to have D.A. and G.H. adjudicated dependent children.  The complaints stated that the voluntary custody agreement was expiring, but J.A.W. was not in a position to adequately parent her children.  J.A.W. suffered from untreated alcohol addiction and mental illness, lacked stable housing, and engaged in physically violent confrontations with her boyfriend.  The juvenile court found that D.A. and G.H. were dependent children, and it granted FCCS temporary custody of both children.  FCCS placed D.A. and G.H. in foster care.

{¶ 6}  FCCS developed a case management plan that required J.A.W. to undergo an assessment for addiction to alcohol and other drugs, and comply with all recommendations made in the assessment.  The case management plan also mandated that J.A.W. undergo a mental health assessment and comply with all recommendations.  Additionally, J.A.W. had to complete random urine screens, attend parenting classes, and maintain independent housing for herself and her children.

{¶ 7}  Netcare performed a substance abuse assessment of J.A.W., and it recommended that she obtain inpatient treatment for substance abuse.  In September 2011, J.A.W. completed a two-week residential treatment program at Maryhaven, an

---

[1] D.A. and G.H. have different fathers.  D.A.'s father has never had or sought custody of D.A.  A.H., G.H.'s father, has retained contact with G.H. since his birth.  A.H. contested FCCS' motion for permanent custody of G.H., and he also sought legal custody of his son.  Ultimately, the juvenile court awarded A.H. legal custody of G.H.  That judgment is the subject of a concurrent appeal, which we resolve in a separate decision.

alcohol and drug treatment center. She then entered an intensive outpatient program at Maryhaven, but she was discharged because she did not maintain her sobriety. In February 2012, J.A.W. participated in a 30-day inpatient detoxification program at Glenbeigh, another alcohol and drug treatment center. At the conclusion of the Glenbeigh program, J.A.W. immediately began an intensive outpatient treatment program at Neil Kennedy Recovery Centers. In May 2012, J.A.W. was terminated from the Neil Kennedy treatment program for failing to stay sober.

{¶ 8} When J.A.W. was not in a residential or inpatient treatment program, she lived with her husband, R.W., whom she married in the fall of 2011. When J.A.W. and R.W. fought, they resorted to physical violence. In late 2011, J.A.W. was arrested after she and R.W. had a physical altercation. J.A.W. was convicted of domestic violence, a violation of R.C. 2919.25. In subsequent fights, J.A.W. threw heavy objects at R.W. Although R.W. was not harmed, J.A.W. has dented a wall and smashed a car window during these episodes.

{¶ 9} In March 2012, FCCS moved for an extension of its temporary custody of G.H, and in June 2012, FCCS filed the same motion with regard to D.A. FCCS stated in its motions that J.A.W. needed additional time to complete case plan objectives. Although J.A.W. had completed parenting classes and consistently visited with D.A. and G.H., her alcohol addiction remained unabated, and she needed to complete anger management classes. The juvenile court granted the motion.

{¶ 10} On September 12, 2012, FCCS moved for permanent custody of D.A. and G.H. By that point, D.A. and G.H. had been in FCCS' custody for over 12 months of a consecutive 22-month period. In relevant part, FCCS stated in its motion that:

> Mother, [J.A.W.,] has failed to make any significant progress in her case plan objectives. Mother has severe chemical dependency issues she has failed to address. Despite recommendations for inpatient treatment, Mother has not completed any long-term drug and alcohol treatment. Mother completed a 30-day inpatient treatment program, but she was subsequently found with alcohol in her home and admitted to drinking. Mother has failed to link with a psychiatrist for her mental health issues. Mother has completed only 17 out of 29 drug screens, with 9 being positive for marijuana and 2 for methadone. She has not completed a drug screen since

> May 21, 2012. She has also failed to complete anger management counseling.

(FCCS' Motion for Permanent Custody, at 5.)

{¶ 11} After her discharge from Neil Kennedy, J.A.W. participated in an outpatient treatment program at Amethyst, yet another alcohol and drug treatment center. In November 2012, J.A.W. began a six-month inpatient treatment program at Maryhaven. J.A.W. successfully completed that program in May 2013.

{¶ 12} With her successful completion of the Maryhaven treatment program, J.A.W. accomplished a major milestone in her struggle against alcohol. Due to J.A.W.'s progress, FCCS allowed her to visit with her children at her home. Initially, the visits went well. Within a few months, however, problems began. J.A.W. began drinking again, and she and R.W. would fight in front of the children. When D.A., G.H., and a social service aide would arrive at J.A.W.'s home for the noontime visits, they encountered difficulty accessing the home because both J.A.W. and R.W. were asleep. J.A.W. would only minimally interact with the children or sleep on the couch during the visits. Less than four months after the home visits began, FCCS moved the visits back to FCCS' offices.

{¶ 13} Between May 2013 and February 2014, eight of J.A.W.'s urine screens were positive for alcohol. J.A.W. stopped reporting for urine screens in February 2014. In April 2014, J.A.W. admitted to an FCCS caseworker that she was drinking alcohol every day. In June 2014, she admitted to smoking marijuana every day. By August 2014, J.A.W. was regularly arriving late to visits with her children or not showing up at all. According to the caseworker then assigned to D.A. and G.H., J.A.W. and R.W. "were having severe marriage problems" and J.A.W. "was using a lot." (Apr. 2, 2015 Tr. 58.) From August 2014 to April 2015, J.A.W. only attended approximately 50 percent of the scheduled visits with her children.

{¶ 14} The juvenile court held a hearing on FCCS' motion for permanent custody on various days beginning August 19, 2014 and ending May 26, 2015. J.A.W. testified twice during the course of the proceedings. On August 19, 2014, J.A.W. testified to many of the facts set forth above and admitted that, "even if the Judge were to grant me custody of any of my kids today, * * * I wouldn't take them. I'm not ready to." (Aug. 19, 2014 Tr. 67.)

{¶ 15} J.A.W. testified again on May 4, 2015. On that date, J.A.W. stated that she had stopped drinking alcohol. J.A.W. also stated that she was no longer living with R.W., and she planned to divorce him. With these changes implemented, J.A.W. felt she could parent D.A. and G.H. again. On cross-examination, J.A.W. admitted that since her August 2014 testimony she had attempted, but failed to successfully complete, another alcohol treatment program. She also acknowledged that, despite her claim to sobriety, she had not completed any urine screens.

{¶ 16} On July 13, 2015, the juvenile court issued a judgment granting FCCS permanent custody of D.A. J.A.W. now appeals that judgment, and she assigns the following error:

> The trial court erred in finding clear and convincing evidence
> to support a finding that it is the best interest of DA to
> terminate the parental rights of appellant.

{¶ 17} The right to parent one's child is a fundamental right. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. That right, however, is not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 11. Although termination of parental rights should be an alternative of last resort, such termination may occur if it is necessary for the welfare of the child. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 41.

{¶ 18} R.C. 2151.414 establishes the two-part test a juvenile court must apply in ruling on a motion by a public children services agency for permanent custody of a child. *In re D.A.* at ¶ 12; *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 9. A juvenile court may grant permanent custody of a child to a public children services agency if, after a hearing, it determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exist and (2) such relief is in the best interest of the child. R.C. 2151.414(B)(1). The circumstances enumerated in R.C. 2151.414(B)(1) are:

> (a) * * * [T]he child cannot be placed with either of the child's
> parents within a reasonable time or should not be placed with
> the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the
> child who are able to take permanent custody.

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 19} Once a juvenile court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then decide whether a grant of permanent custody is in the best interest of the child. Pursuant to R.C. 2151.414(D)(1), to make this decision, the juvenile court must "consider all relevant factors, including, but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 20} An appellate court will not reverse a juvenile court's determination in a permanent custody case unless that determination is against the manifest weight of the evidence. *In re B.W.*, 10th Dist. No. 15AP-38, 2015-Ohio-2360, ¶ 12. In reviewing the judgment of the juvenile court, an appellate court must make every reasonable

presumption in favor of the judgment and the juvenile court's findings of fact. *In re A.B.*, 10th Dist. No. 15AP-105, 2015-Ohio-3849, ¶ 25. If the evidence is susceptible to more than one construction, an appellate court must give the evidence that interpretation which is consistent with the judgment. *Id.* With these precepts in mind, we must weigh the evidence and all reasonable inferences to determine whether the juvenile court " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *In re G.D.*, 10th Dist. No. 14AP-801, 2015-Ohio-1969, ¶ 28, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 21} Here, no one disputes that D.A. had been in FCCS' custody for over 12 months of a consecutive 22-month period when FCCS moved for permanent custody. Thus, FCCS satisfied the first part of the two-part test the juvenile court applies to decide whether to grant permanent custody of a child to a public children services agency.

{¶ 22} As the evidence establishes one of the R.C. 2151.414(B)(1) circumstances, we next review whether the evidence proves that a grant of permanent custody to FCCS is in D.A.'s best interest. In large part, the juvenile court's decision to grant FCCS permanent custody turned on its conclusion that a legally secure placement for D.A. could not be achieved without granting FCCS permanent custody. The juvenile court determined that J.A.W. could not provide a legally secure placement for multiple reasons. First, J.A.W. could not provide stable housing for D.A. J.A.W. moves often, generally due to eviction for failure to pay rent. Sometime in early 2015, J.A.W. began living in a homeless shelter. J.A.W. left the homeless shelter in late April 2015, when a woman she met at the shelter agreed to allow J.A.W. to live with her in a duplex she rented. J.A.W. testified that her roommate had agreed to leave the duplex and transfer the lease into J.A.W.'s name if J.A.W. obtained custody of her children. However, J.A.W.'s lack of income presents a major impediment to the feasibility of this plan.

{¶ 23} When J.A.W. testified on May 4, 2015, she admitted that she did not have a job and, thus, had no income to pay the rent on the duplex. J.A.W. indicated that she planned to find a job, but J.A.W. has never maintained steady employment. While involved with FCCS, J.A.W. has worked multiple service jobs, typically in fast-food restaurants. Generally, J.A.W. is fired, or she quits because she does not like the job or how other employees treat her. J.A.W.'s longest period of employment was when she

worked six months for Speedway. Moreover, on April 27, 2015, J.A.W. told an FCCS caseworker that she was having difficulty finding work because potential employers often require drug tests, and her results would show drug use.

{¶ 24} Second, J.A.W. struggles with alcohol dependency. J.A.W. has admitted that she has a substance abuse problem. As set forth above, J.A.W. has attended multiple treatment programs, but she has failed to maintain sobriety on a consistent basis. Nevertheless, at the May 4, 2015 hearing, J.A.W. claimed that she had stopped drinking alcohol. J.A.W., however, had not completed any urine screens. Without the independent evidence that a clean screen would have provided, the juvenile court understandably doubted J.A.W.'s claim that she had achieved lasting sobriety.

{¶ 25} Third, the danger of domestic violence remains. As the juvenile court found, J.A.W. and R.W. have an extensive history of domestic violence. While J.A.W. testified that she has separated from R.W. and plans to divorce him, the juvenile court still expressed concern about J.A.W's propensity for violence, stating that "the separation or divorce [is not] enough to show that [J.A.W.] is now stable and able to provide a home for her son." (July 13, 2015 Decision and Judgment Entry, at 8.) Moreover, J.A.W. and R.W. have previously separated and then reunited, so the juvenile court could not conclude that J.A.W. and R.W. would remain separated.

{¶ 26} J.A.W. takes issue with the juvenile court's conclusion that she was often too high or intoxicated to parent D.A. and G.H. during her visits with them. According to a social services aide and an FCCS caseworker who observed visits between J.A.W. and her children, the level of J.A.W.'s engagement with D.A. and G.H. during visits varied. Both FCCS witnesses testified regarding visits in which J.A.W. was disengaged or falling asleep. These visits generally corresponded with periods during which J.A.W. was not receiving treatment for her addiction. Moreover, FCCS' records show that J.A.W. was under the influence during more than one visit. Consequently, we concur with the juvenile court's interpretation of the evidence regarding J.A.W.'s behavior during visits and the reason behind her behavior.

{¶ 27} J.A.W. also argues that the juvenile court was wrong to find her mentally unstable. J.A.W. admitted during the hearing that she has been diagnosed with bipolar disorder, borderline personality disorder, and anxiety. According to an FCCS caseworker

assigned to D.A. and G.H., J.A.W. recognized a need for mental health treatment but resisted it. The FCCS caseworker testified that J.A.W. had received some mental health counseling, but she quit attending appointments after three or four months. Given this evidence, we find no error in the juvenile court's conclusion regarding J.A.W.'s mental health issues.

{¶ 28} In sum, we conclude that the manifest weight of the evidence supports the juvenile court's conclusion that that a legally secure placement for D.A. could not be achieved without granting FCCS permanent custody. J.A.W. has neither the material nor mental wherewithal to provide D.A. with a stable, secure home.

{¶ 29} In her final argument, J.A.W. attacks the juvenile court's analysis of the first R.C. 2151.414(D)(1) factor, which requires consideration of the relationship between D.A. and his mother and half-brother. The juvenile court recognized that D.A. and J.A.W. share a bond. The juvenile court nevertheless awarded FCCS permanent custody because it found J.A.W. incapable of caring for D.A. on a regular basis.

{¶ 30} The juvenile court also acknowledged that D.A. has a strong bond with his half-brother, G.H. For most of their young lives, the two boys have lived together, and, by all accounts, they share a close relationship. The juvenile court expressed hesitation in awarding FCCS permanent custody of D.A. because that would separate the brothers.[2] However, the juvenile court could only ensure D.A. a legally secure placement by granting FCCS permanent custody, while G.H. had a legally secure placement in his father's home. We conclude that the juvenile court exercised sound judgment in a difficult situation. While the award of permanent custody to FCCS severed D.A.'s familial bonds to his mother and half-brother, D.A.'s need for a legally secure placement justified the juvenile court's decision.

{¶ 31} After reviewing the totality of the evidence and J.A.W.'s arguments, we conclude that the manifest weight of the evidence supports the award of permanent custody of D.A. to FCCS. Accordingly, we overrule J.A.W.'s sole assignment of error, and

---

[2] As we explained above, the juvenile court granted G.H.'s father, A.H., legal custody of G.H.

we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

TYACK and BRUNNER, JJ., concur.

---