[Cite as *In re S.M.S.B.*, 2023-Ohio-1532.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| In the Matter of: S.M.S.B. | : | Case No. 22CA17 |
| | : | |
| Adjudicated Abused/Dependent/ | : | DECISION AND |
| Neglected Child. | : | JUDGMENT ENTRY |

**RELEASED 5/03/2023**

_____

APPEARANCES:

Angela Miller, Jupiter, Florida, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and Jenna J. Waldo, Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.

_____

Hess, J.

{¶1}    D.B., the father of S.M.S.B., appeals from a judgment of the Lawrence County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to the Lawrence County Department of Job and Family Services, Children Services Division (the "Agency").  He presents two assignments of error asserting that the juvenile court impermissibly denied him a reasonable continuance of the permanent custody hearing and that the permanent custody award is against the manifest weight of the evidence.  However, the juvenile court did not abuse its discretion when it denied the requested continuance.  Moreover, after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the juvenile court's determinations, we conclude that in resolving evidentiary conflicts, the court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its permanent custody award.  Accordingly, we overrule the assignments of error and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} On February 8, 2021, the juvenile court granted the Agency ex parte custody of S.M.S.B., d.o.b. 1/28/21. The next day, the Agency filed a complaint alleging that S.M.S.B. appeared to be an abused, neglected, and dependent child. The complaint alleged that the child had tested positive at birth for methamphetamine and amphetamine as a result of the drug abuse of her mother, K.F. ("Mother"), that Mother admitted to medical staff that she did not receive prenatal care, and that Mother and the child's "biological or alleged father," D.B. ("Father"), tested positive for methamphetamine, amphetamine, and ecstasy—unprescribed drugs which were "illegal to ingest." The Agency sought a disposition of temporary custody. The juvenile court conducted a shelter care hearing the same day the Agency filed the complaint, and the child remained in the Agency's custody.

{¶3} Later, the juvenile court conducted an adjudicatory hearing at which Mother and Father admitted the allegations in the complaint. On April 7, 2021, the court issued a judgment entry adjudicating the child an abused, neglected, and dependent child. The court conducted a dispositional hearing, and on May 3, 2021, the court issued a dispositional entry finding it was in the best interest of the child to remain in the temporary custody of the Agency. The court also ordered the Agency to coordinate genetic testing of Father. The test results confirmed Father was the child's biological father. The juvenile court conducted several review hearings, and the child remained in the Agency's temporary custody.

{¶4} On March 4, 2022, the juvenile court issued a judgment entry stating that neither parent appeared at a review hearing the day before, that Mother had "not made

any efforts towards case plan compliance or to obtain any treatment," and that Father had "left treatment" and "gone several weeks without contact with the Agency or visits with the child." On March 23, 2022, the Agency filed a motion for permanent custody. The motion alleged that the child had been in the Agency's temporary custody since February 8, 2021, noted the court's findings about the parents in the March 4, 2022 entry, and asserted that a grant of permanent custody would be in the child's best interest. Two days after the Agency filed the motion, Father's attorney was personally served with notice of the motion and notice that the court had scheduled the matter for pretrial on May 19, 2022, and for hearing on June 23, 2022. Father, who was reportedly at STAR Community Justice Center, did not appear at the pretrial. On June 21, 2022, the child's guardian ad litem filed her final report and recommended that the juvenile court grant the permanent custody motion.

{¶5} On June 23, 2022, the juvenile court conducted the permanent custody hearing. At the start of the hearing, the court explained that Father was "currently being transported," so the court was "going to bifurcate the hearing somewhat" and address issues related to Mother first. Mother's counsel moved for a continuance so that Mother could go into treatment that day. The court denied the motion.

{¶6} After two witnesses gave their testimony regarding Mother, Father arrived and his counsel moved for a continuance of the proceedings as they related to Father. Counsel explained that Father was "incarcerated at STAR," and would "be out July 14th or sometime in August." Counsel asserted that "to proceed against [Father] for permanent custody is in a way making him face double jeopardy and adding a penalty to his criminal case that was never considered at that time." Counsel asked the court to grant "a

continuance and allow [Father] to work the case plan." Counsel asserted that Father had "done two parenting classes" and substance abuse counseling and had plans to go to a sober living facility after his release from STAR. The court denied the motion.

{¶7} Dave Carey, an Agency employee, testified that on February 2, 2021, the Agency received a report that Mother tested positive for methamphetamine and amphetamine when she gave birth to S.M.S.B. Mother had no prenatal care. At some point, both parents tested positive for methamphetamine, amphetamine, and ecstasy, and the Agency requested custody before the child left the hospital. The child was placed into foster care and had been in the same foster home since leaving the hospital. Carey testified that she "is doing phenomenal," "is healthy and happy," and is "one hundred percent bonded with" her foster parents.

{¶8} In April 2021, Carey developed a case plan with a goal of reunification. Among other things, the plan required that the parents get a mental health assessment, go to substance abuse counseling, take parenting classes, and have stable housing and employment. Mother did not complete any part of the plan. She did an assessment at Mended Reeds sometime prior to May 14, 2021, but did not return for services. She was unemployed and did not have stable housing. Carey's contact with Mother was "very sporadic," and Mother had no contact with the child after the child left the hospital. The Agency did not permit visits because Mother was "never able to provide" a clean drug screen.

{¶9} Carey testified that when the case was assigned to him in March 2021, Father was employed as a mechanic with a logging company and "was kind of hard to get in touch with." Carey did not think Father completed any part of the case plan. Carey

believed Father was aware of the plan requirements and recalled discussing them with Father the day of his DNA test, May 20, 2021. Carey testified that like Mother, Father got an assessment at Mended Reeds sometime prior to May 14, 2021, but failed to return for services and was discharged. At a July 2021 court date, Father advised Carey that he had been picked up on a warrant, had reached an agreement with a court under which he would be released if he got "services," and was "in a sober living home" at Riverside Recovery Services ("Riverside"). Carey testified that "for a while [Father] did very well at Riverside" and was a "rockstar." Father "was doing well in counseling" and passing drug tests. Father had his first visit with the child on August 6, 2021. Carey testified that Father did not have visits before then due to "drug screens and availability." The first visit "went very well," and afterwards, Father had weekly one-hour visits with the child.

{¶10} But on December 20, 2021, Carey received notice from Riverside that Father had returned from a weekend pass and tested positive for methamphetamine and amphetamine. Carey suspended visits for a few weeks. They resumed sometime in January 2022 once Father gave a clean drug screen. Father's last visit was in early February 2022. Carey suspended visits again sometime that month because Father did not contact Carey or do drug screens. On March 7, 2022, Father requested a visit, and Carey advised Father that visits were suspended and that he needed to complete a drug screen within an hour. Father did not complete one. At some point, Father failed a drug test from his probation officer, and in mid-March 2022, Father went to court on the probation violation and was sentenced to STAR. Carey visited Father at STAR in April and May 2022. Father told Carey he expected to be released from STAR in July 2022 and wanted to go back to Riverside and try to get the child back. Father said that he was

"going to fight" for his child. Carey testified that Father was taking a parenting class at STAR, but Carey did not know that Father had completed the class until his counsel showed Carey a certificate of completion.

{¶11} Mary Dalrymple, a court liaison at Mended Reeds, testified that on May 6, 2021, Mother completed an assessment and became a patient at Mended Reeds. Mended Reeds recommended inpatient care, which Mother refused to do, so Mended Reeds set her up with outpatient services. Mother did not return for services, so Mended Reeds sent her an intent to discharge letter. Mother then came to one individual session in June 2021, but she did not return, so Mended Reeds discharged her in July 2021. Dalrymple testified that Father failed to complete recommended services at Mended Reeds on four occasions. He failed to complete inpatient services twice in 2020. On May 6, 2021, he returned and completed an assessment. Dalrymple believed Mended Reeds recommended inpatient care but was "not a hundred percent on that." Father agreed to an outpatient services plan but did not return for services, so Mended Reeds discharged him in July 2021. Father later received inpatient services from March 8, 2022, until March 14, 2022, when he left against medical advice.

{¶12} Michael Arthur, a client specialist at Riverside, testified that Lawrence County Adult Probation referred Father to Riverside. On July 9, 2021, Father completed the admissions process. He was placed in a level 2.5 facility which is a "pretty structured" day treatment facility with supportive housing. On October 4, 2021, Father transitioned to a level 2.1 facility which provides intensive outpatient treatment with supportive housing. Clients there are eligible to work after 21 days, and if they demonstrate the ability to balance treatment and work, they are eligible to transition to a traditional sober living

house where they have more freedom. On November 4, 2021, Father transitioned to the Solida sober living facility. On January 31, 2022, Father completed his stay at Solida and left with a recommendation to continue treatment at the outpatient office without a supportive housing element. Father did an assessment at the outpatient office but reportedly had no contact with the office after that time. Arthur testified that Father did not have any documented rule violations or positive drug screens at Riverside.

{¶13} Roberta Boyd, an intake coordinator at Riverside, testified that she was a program manager at Solida when Father was there, i.e., around mid-November 2021 until January 31, 2022. Father obtained employment as required and complied with all treatment recommendations. However, he failed a urine screen in December 2021, testing positive for methamphetamine and amphetamine "after being on a pass." Father was placed on a 30-day "behavior contract" because "the screen * * * was a small amount," Father did not admit to using, and Father stated that he had been in contact with someone who was using. Father's "home passes were revoked," he "was not allowed to have visitation with his daughter through CPS," and he lost cell phone privileges though he was allowed to make limited phone calls to his children and immediate family. Father had to complete a series of assignments, have negative drug screens, and complete a relapse prevention plan. Father wanted to finish treatment to get custody of his daughter, and he completed the behavior contract around the second week of January 2022. Father completed the goals of his treatment plan at Solida, obtained an apartment, and was working, and he left Solida at the end of the month with a recommendation for outpatient care. On February 1, 2022, Father went to the outpatient office, but he never returned for treatment, and Riverside discharged him. Boyd testified that Father's case manager

at STAR had contacted her about prescreening Father for placement at Riverside after he completed STAR, which would be in July 2022 at the earliest. Boyd testified that if Father returned to Riverside, he would go to a "2.1 facility" for about 30 days and transition to a sober living house again, where he would remain until at least 90 days after his completion of STAR.

{¶14} C.F. testified that she and her husband have been the child's foster parents since they brought the child home from the hospital in February 2021. The placement "started off a little rough" because the child was addicted to drugs and had formula intolerances, allergies, and sensitive skin. However, the child had come "a long way from where she first began," was "doing very, very well," and had "met all of her milestones." C.F. testified that she has never had contact with Mother, who never visited the child. Father had visited the child, typically for one hour a week. The visits "went okay." Father's interactions with the child were appropriate, and the child "interacted with him some and they would just play a little bit." Father's last visit was February 7, 2022. After that, C.F. had no contact with Father. C.F. testified that it would "[o]ne hundred percent" be her desire to adopt the child if the Agency received permanent custody.

{¶15} Father testified that he was 39 years old and had "a lot of convictions." He was incarcerated from 2002 to 2010. He was convicted of drug possession in 2015 and served eight months in prison. He also "served a fourteen-year sentence out in Kentucky in 2019" for "criminal mischief in the first degree." In 2020, Father was charged with aggravated possession of drugs, a fifth-degree felony. In September 2021, he pleaded guilty, and the trial court in that case granted his request for intervention in lieu of conviction ("ILC"), stayed the criminal proceedings, and ordered Father to comply with

terms set forth by the Bureau of Community Control, which included successfully completing the alcohol and drug treatment program he was enrolled in at Riverside. Father violated the terms by using methamphetamine. He was arrested, and on March 17, 2022, he was sentenced to continue his ILC treatment and complete the STAR Community Justice Program. Father testified that if he completed ILC his case would be dismissed.

{¶16} Father also testified that he has been a drug addict for 28 years. His longest period of sobriety was when he was incarcerated from 2002 to 2010. He started using again 90 days after his release and consistently used drugs until 2020. Father testified that he had not used drugs since February 2022. Father believed that he had complied with Riverside's recommendation for outpatient treatment—he just did not use Riverside's services. He testified, "I had to switch to Mended Reeds and was arrested on the day of the date of my outpatient at Mended Reeds" "for a dirty urinalysis."

{¶17} Father testified that he completed parenting programs at Riverside and STAR. He felt STAR was helping him become a better father and was teaching him that his behavior has "a ripple effect" which impacts those around him. Father wanted the court to continue the case to allow him a reasonable opportunity to complete any outstanding case plan requirements. When asked if he felt that he could complete the case plan if given time after his release from STAR, Father testified, "Uh, yes, if I could get a copy of the case plan, show me exactly what needs to be done, it could be done, or somebody to go over the case plan with me, exactly what needs to be done." Father thought the case plan had been "addressed in court one time" but did not recall anyone from the Agency reviewing it with him. Father testified that his estimated release date

from STAR was in July 2022.  He planned to then go "to sober living back at Riverside" for 90 days "or longer if needed."  Father testified, "I have a job waiting, I just got to get my license back and then I'll have a place to live."  He testified that he was going back to work at a timber harvesting business where he had been employed for 12 years and that he could get his license back by paying a $40 fee and taking an examination.

**{¶18}**  Father testified that he has four children, and S.M.S.B. is the youngest.  The older children live with their mother, Father's wife, from whom he is separated. Father sees those children and gave his wife financial support for them prior to going to STAR. He never provided support for S.M.S.B. but had "not been asked to" do so. Father testified that his visits with S.M.S.B. "meant a lot to" him and were his weekly "motivation."  And even though he has "messed up," his "kids still come first with everything."

**{¶19}**  On July 20, 2022, the juvenile court issued a judgment entry granting the Agency's permanent custody motion. On October 17, 2022, Father filed a motion for leave to file a delayed appeal from this entry, which we granted.

## II.  ASSIGNMENTS OF ERROR

**{¶20}**  Father presents two assignments of error:

I.      The juvenile court's judgment granting permanent court commitment (PCC) of the minor child to Lawrence County Department of Job and Family Services, Children Services Division (LCCS) is against the manifest weight of the evidence.

II.     The juvenile court impermissibly denied [Father] a reasonable continuance of the trial for permanent custody.

We will address the assignments of error out of order.

### III. MOTION FOR CONTINUANCE

{¶21} In the second assignment of error, Father contends that the juvenile court impermissibly denied him a reasonable continuance of the permanent custody hearing. Father asserts that "[t]his is not a case that had been open for an extended period," that "no other continuances had been requested," and that "the trial court, litigants, and witnesses would not have been inconvenienced by a delay." He claims the court "was not up against any hard deadlines" because under R.C. 2151.414(A)(2), the court had until July 2022 to conduct the hearing, the court could have conducted the hearing after July 2022 for good cause shown, and the court had until October 2022 to resolve the permanent custody motion. Thus, at a minimum, the court could have continued the hearing until July 2022 when he "was scheduled to be released from STAR." Father contends he had a "legitimate basis" for requesting a continuance and did not request one as a delay tactic. Father asserts that he "made significant progress on his case plan prior to his relapse," to the point that Carey characterized him as a "rockstar." Father asserts that he "completed treatment, obtained housing, and had a job." He "simply needed additional time due to his recent placement in the STAR program" and "had plans to transition to independent living, work, and complete counseling."

{¶22} "The determination whether to grant a continuance is entrusted to the broad discretion of the trial court." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus. " 'An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.' " *State v. Jones*, 91 Ohio St.3d 335, 342, 744 N.E.2d 1163 (2001), quoting *Unger* at 67. An abuse of discretion is an "unreasonable, arbitrary,

or unconscionable use of discretion, or * * * a view or action that no conscientious judge

could honestly have taken." *State v. Brady,* 119 Ohio St.3d 375, 2008-Ohio-4493, 894

N.E.2d 671, ¶ 23.

{¶23}  We have explained:

> The Supreme Court of Ohio has adopted a balancing approach that recognizes "all the competing considerations" to determine whether a trial court's denial of a motion to continue constitutes an abuse of discretion. *Unger,* 67 Ohio St.2d at 67.  In exercising its discretion, a trial court should "[w]eigh[ ] against any potential prejudice to a defendant * * * concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Id.*  A court should also consider: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique circumstances of the case. *Id.*; *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 45.

> " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' "  *Unger,* 67 Ohio St.2d at 67, quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *State v. Broom*, 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988) ("Obviously, not every denial of a continuance constitutes a denial of due process.").  Furthermore, "[o]n review we must look at the facts of each case and the [appellant] must show how [the appellant] was prejudiced by the denial of the continuance before there can be a finding of prejudicial error." *Broom*, 40 Ohio St.3d at 288.  Additionally, with respect to the continuance of juvenile court hearings, Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."

(Second to last alteration added.)  *In re Ca.S.*, 4th Dist. Pickaway Nos. 21CA9, 21CA10,

2021-Ohio-3874, ¶ 33-34.

{¶24}  The juvenile court's decision to deny Father's motion for a continuance was

not unreasonable, arbitrary, or unconscionable.  Father did not request a specific duration

for the continuance and had not previously requested a continuance of the permanent custody hearing. However, a continuance would have presumably inconvenienced the court, the Agency, and its witnesses as they were prepared to proceed. Father offered a legitimate reason for the continuance—having more time to work on his case plan. However, he caused the circumstance which gave rise to his request for a continuance. He failed to complete his case plan despite having more than a year to work on it. And as the juvenile court explained in its permanent custody decision, Father's "lengthy addiction and lack of ability to maintain sobriety in a non-structured setting for any significant period of time" made it "unlikely" that he would "be able to complete the case plan in a reasonable amount of time." Thus, we conclude that the juvenile court did not err when it denied Father's motion for a continuance, and we overrule the second assignment of error.

## IV. PERMANENT CUSTODY AWARD

{¶25} In the first assignment of error, Father contends that the permanent custody award is against the manifest weight of the evidence.

### A. Standard of Review

{¶26} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21. We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.) *Id.* at ¶ 21-22.

## B.  Statutory Framework

**{¶27}** R.C. 2151.414(B)(1) sets forth a two-part test for ruling on a public children services agency's motion for permanent custody.[1]  A juvenile court may grant permanent custody "if, after a hearing, it determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exist and (2) such relief is in the

---

[1] In its appellee's brief, the Agency cites R.C. 2151.414(B)(2), which states: "With respect to a motion made pursuant to division (D)(2) of section 2151.413 of the Revised Code, the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest."  R.C. 2151.414(B)(2) is inapplicable.  It applies only to motions made pursuant to R.C. 2151.413(D)(2), which applies only if the court determines under R.C. 2151.419(A)(2) that "the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home."  The juvenile court made no such finding in this case.

best interest of the child." *In re G.H.*, 10th Dist. Franklin No. 15AP-752, 2016-Ohio-1188,

¶ 16. The circumstances in R.C. 2151.414(B)(1)(a) through (e) are:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶28}** R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

\* \* \*

Relevant here, R.C. 2151.414(E)(10) states: "The parent has abandoned the child."

**{¶29}** No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. "Instead, the trial court considers the totality of the circumstances when making its best interest determination." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 24.

### C. R.C. 2151.414(B)(1)(a)-(e) Circumstances

**{¶30}** In this case, the juvenile court's findings implicate R.C. 2151.414(B)(1)(b) and (B)(1)(d). The court found that the child is abandoned, i.e., R.C. 2151.414(B)(1)(b), and the court found that the child had been in the temporary custody of the Agency for "over twelve months of a consecutive twenty-two month period," i.e., R.C. 2151.414(B)(1)(d). Father disputes the finding that he abandoned the child but concedes the child was in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. So regardless whether R.C. 2151.414(B)(1)(b) applies, we must affirm the permanent custody award under R.C. 2151.414(B)(1)(d) unless the juvenile court's best interest determination is against the manifest weight of the evidence. However, as we explain in the next section, the juvenile court did not err when it found Father abandoned the child.

D.  Best Interest of the Child

{¶31}  Father contends that a grant of permanent custody to the Agency is not in the best interest of the child. Father maintains that the juvenile court "ignored perhaps the most important piece of evidence presented at trial:  the love and connection between a father and his daughter." He claims the court erred by failing "to acknowledge the existence" of this bond and assign it "any weight."  Father asserts that prior to his positive drug screen in December 2021, he had regular visits with the child which "went very well." He claims that after the positive drug screen, he "was able to quickly get back on track and visits resumed until his commitment to STAR in March 2022."  Father emphasizes testimony about him looking forward to visits with the child, her being his motivation to get clean, and him wanting to fight for her. Father asserts that even though he relapsed, he "did not fail to show love and support for" the child and "demonstrated commitment" to her.  He asserts that their bond "had greater significance because of the substantial efforts" he made "to complete assessments, work with counselors, complete parenting programs, obtain housing, and secure employment."  He asserts that at the time of the permanent custody hearing, he had "completed an additional parenting class," was "doing well at STAR," had "been free of drugs," had "obtained employment," and "was working towards a sober living arrangement."  Father asserts that there is no evidence he harmed the child, is likely to "harm, abuse or neglect" the child, or "would fail to protect her from harm in the future" and asserts that he just needed more time to complete STAR "and regain the progress he made before."

{¶32}  Father also asserts that he did not abandon the child as the juvenile court found.  Father acknowledges there is a statutory presumption of abandonment when a

parent fails to visit or maintain contact with a child for more than 90 days. However, he asserts that he rebutted the presumption because the record shows that he visited the child regularly and "had very good visits" with her "until his commitment to STAR," "where he could not freely leave to visit his daughter."

{¶33} The state suggests that we should find the permanent custody award is not against the manifest weight of the evidence based solely on Father's concession that the child was in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period and not consider the other best interest factors. The state directs our attention to the fact that the Fifth District Court of Appeals has stated that it "has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody" and that with such proof "a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence." *In re R.R.*, 5th Dist. Coshocton No. 2022CA0009, 2022-Ohio-3725, ¶ 40; *In re R.M.*, 5th Dist. Stark No. 2021CA00085, 2021-Ohio-4378, ¶ 36. Alternatively, the state argues that the best interest factors collectively weigh in favor of an award of permanent custody to the Agency.

{¶34} In making a best interest determination, the juvenile court must "consider all relevant factors." R.C. 2151.414(D)(1). And in reviewing the juvenile court's judgment, this court must " 'weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.' " *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21, quoting *In re T.J.*, 4th Dist. Highland Nos. 15CA15,

15CA16, 2016-Ohio-163, ¶ 25.  Therefore, we will proceed to do just that and consider evidence regarding all relevant best interest factors in reviewing the juvenile court's best interest determination.

### 1.  Interactions and Interrelationships of the Child

**{¶35}** The child has no relationship with Mother.  It is unknown what contact Father had with the child before the Agency got temporary custody in February 2021.  After the Agency got temporary custody, Father had no visits with the child until August 2021.  There is evidence that Father loves the child and had a relationship with her from August 2021 until February 2022.  However, he only saw the child about an hour a week during that timeframe.  And at the time of the permanent custody hearing in June 2022, Father had not visited the child since February 2022.  Evidence supports the juvenile court's finding that the child is thriving in her foster home—the only home she has ever known—and that her foster parents were willing to adopt her if the juvenile court granted the Agency permanent custody.

### 2.  Wishes of the Child

**{¶36}** The child was about 17 months old at the time of the permanent custody hearing and evidently too young to convey her wishes.

### 3.  Custodial History

**{¶37}** Father concedes the child was in the Agency's temporary custody for 12 or more months of a consecutive 22-month period.  The child has only ever lived with her foster parents.

4.  Legally Secure Permanent Placement

**{¶38}** The Ohio Revised Code does not define the phrase "legally secure permanent placement"; however, "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56.  "A legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶39}** The evidence adduced at the permanent custody hearing supports the juvenile court's finding that the child needs a legally secure placement which cannot be achieved without a grant of permanent custody to the Agency.  Mother has no relationship with the child and did not complete the case plan.  Although Father had some relationship with the child and made some progress on the case plan, "the permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 34.  "[K]eeping children in limbo is not in their best interests." *Id.*  Moreover, "[t]his court has recognized that a parent's past history is one of the best predictors of future behavior." *Id.* at ¶ 33.  As the juvenile court found, Father's "lengthy addiction and lack of ability to maintain sobriety in a non-structured setting for any significant period of time" made it "unlikely" that he would "be able to complete the case plan in a reasonable amount of time."  In addition, there is evidence that if the Agency has permanent custody, the child's

foster parents will seek to adopt her.  Thus, a grant of permanent custody to the Agency will allow the child to attain a legally secure permanent placement.

5.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶40}** The juvenile court's finding that the child was abandoned implicates the factor in R.C. 2151.414(E)(10), i.e., "[t]he parent has abandoned the child," even though the court did not specifically cite that section.  For purposes of R.C. Chapter 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."  R.C. 2151.011(C).  The juvenile court found that neither parent had had contact with the child for more than 90 days.  The court explained that Mother "has not had any contact with the child since leaving the hospital after the child's birth" and that Father "has not had any visits or contact since February 2022."

**{¶41}**  Father does not dispute the finding that at the time of the permanent custody hearing, he had not contacted the child since February 2022, i.e., for more than 90 days. Father's contention that he rebutted the presumption of abandonment because he had regular visits with the child which went well "until his commitment to STAR," "where he could not freely leave to visit his daughter," is not well-taken. "Precedent supports application of the presumption of abandonment to incarcerated parents who do not visit or contact their child for the 90-day period * * *." *In re C.B.*, 4th Dist. Highland No. 16CA22, 2016-Ohio-8293, ¶ 23.  While Father may have been unable to visit the child while at STAR, his visits ceased before he went to STAR, and there is no evidence that he was unable to contact the child in other ways.  *See id.* at ¶ 24 ("although the agency may have

prevented [the father] from physically visiting the child while he was in prison, there was no evidence that it prevented him from contacting his son in other ways, e.g., by telephone or mail"); *In re P.*, 1st Dist. Hamilton Nos. C-190309, C-190310, 2019-Ohio-3637, ¶ 47 ("Even if a parent is unable to engage in visitations, the parent can maintain contact with the children so as to avoid abandoning them by communicating with them through phone calls, letters, or cards").

### 6. Totality of the Circumstances

**{¶42}** Based on the foregoing, we conclude the juvenile court's best interest finding is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the child. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence and overrule the first assignment of error.

### V. CONCLUSION

**{¶43}** Having overruled the assignments of error, we affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
          Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**